[No. B229432. Second Dist., Div. Six. Apr. 3, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
RAUL BECERRA QUIROZ, Defendant and Appellant.

## COUNSEL

Law Offices of Gregory R. Ellis and Gregory R. Ellis for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant´ Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOFFSTADT, J.**[*]—A jury unanimously agrees that a defendant is guilty of murder. Must all jurors either unanimously agree defendant is the killer, or unanimously agree that he aided and abetted the killer? Appellant Raul Becerra Quiroz (Quiroz) argues that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*) requires all jurors to agree on the same theory of legal liability. We disagree. We also reject Quiroz's arguments that the People's request for an aiding and abetting instruction deprived him of his right to counsel and that such an instruction may be given only if the People name the killer. We further conclude that Quiroz's remaining arguments lack merit. We affirm his conviction for first degree murder.

### FACTS AND PROCEDURAL HISTORY

#### The Crime

Early in the morning of August 27, 2005, Brian Szostek (Szostek) was shot four times while sitting in the rear passenger seat of a gold Pontiac. He was dumped in an alley in Oxnard and died soon thereafter.

Quiroz and Szostek were childhood friends. Several months prior to his death, Szostek had called Quiroz for the telephone numbers of two drug dealers. Unbeknownst to Quiroz, Szostek was cooperating with law enforcement. Both dealers were subsequently arrested after drug buys Szostek arranged. One of those dealers, Hector Flores, later asked Quiroz about Szostek's connection to undercover officers. Flores closed their discussion by asking, "Are we on?" Quiroz replied, "Right on, dude."

The night before the shooting, Quiroz borrowed the gold Pontiac, picked up Szostek, and dropped him off at a house in Oxnard. Later that evening, Szostek and three other men drove around in the Pontiac for hours. Quiroz's presence in the car was disputed. Quiroz admitted to two fellow inmates that he had been present (and had shot Szostek), and Quiroz's account was corroborated by one of the car's passengers and by two other witnesses who had seen Quiroz or someone who looked "very familiar [*sic*: similar]" to Quiroz in the car that night. At trial, however, the passenger recanted his prior statement and said Quiroz was not present.

Just hours after the shooting, Quiroz was driving around in the Pontiac with the same passenger who initially said Quiroz was present when Szostek

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

was shot that morning. Quiroz showed up uninvited at the home of one of the two people who had picked up Szostek's body at the scene and transported it to the coroner's office. Quiroz also vacuumed up the glass of the Pontiac's window shattered by the gunshots. Quiroz then returned the car to its owner, and told him to "lay low."

### Prosecution

The People charged Quiroz with the first degree murder of Szostek (Pen. Code, § 187, subd. (a)),[1] and being a felon in possession of a firearm (former § 12021, subd. (a)(1), repealed by Stats. 2010, ch. 711, § 4). The People also alleged Quiroz personally used a firearm in committing the murder (former § 12022.5, subd. (a)(1)).

In the midst of voir dire, the People submitted proposed jury instructions, including an aiding and abetting instruction. After the People rested their case-in-chief and after Quiroz had called two of his witnesses, the trial court held its initial jury instruction conference. At that conference, the People again requested that the jury be instructed on the theories of aiding and abetting liability and direct liability. Over Quiroz's objection, the court tentatively ruled that substantial evidence supported Quiroz's liability as an aider and abettor. Quiroz then called another six witnesses.

At the final conference on jury instructions, Quiroz renewed his objection to any aiding and abetting instruction. He did not request an instruction requiring juror unanimity in selecting between aiding and abetting liability and direct liability. The trial court instructed the jury on direct and aiding and abetting liability. During his closing argument, Quiroz criticized the People for shifting their story from Quiroz as the shooter, to Quiroz as an aider and abettor.

The jury found Quiroz guilty of murder and being a felon in possession of a firearm, but split 11 to one on whether Quiroz personally used a firearm. The court declared a mistrial on the personal use of a firearm allegation, and sentenced Quiroz to 28 years to life in prison.

### DISCUSSION

Quiroz argues that the trial court erred in instructing the jury on aiding and abetting liability because (1) the People requested the instruction so late in the trial as to deny him the effective assistance of his counsel and (2) the People never identified the shooter. Quiroz further contends that any aiding

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

and abetting instruction, even if properly given, should have been accompanied by an instruction requiring the jurors to agree unanimously that Quiroz was either the principal or an aider and abettor.

### I.  *Timeliness of Request for Instruction*

Quiroz asserts that the People unconstitutionally interfered with his right to counsel by proposing their alternative, aiding and abetting theory too late in the trial proceedings. Quiroz contends that his counsel had no ability to respond to this new theory due to this late notice. Drawing on *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234 (*Sheppard*) and cases addressing state interference with the right to counsel, Quiroz argues that this error is structural and automatically reversible. Because this involves questions of constitutional law and mixed questions that are predominantly legal, we review Quiroz's contentions de novo. (See *Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10]; *People v. Waidla* (2000) 22 Cal.4th 690, 730–731 [94 Cal.Rptr.2d 396, 996 P.2d 46].) We conclude that Quiroz had ample notice, and that his deprivation of counsel claim accordingly lacks merit.

■ Under California's practice of short-form pleading, an instrument charging a defendant as a principal is deemed to charge him as an aider and abettor as well. (§ 971.) This "notice as a principal is sufficient to support a conviction as an aider or abettor . . . '. . . without the accusatory pleading reciting the aiding and abetting theory . . . .' " (*People v. Garrison* (1989) 47 Cal.3d 746, 776, fn. 12 [254 Cal.Rptr. 257, 765 P.2d 419]; see *People v. Ardoin* (2011) 196 Cal.App.4th 102, 131 [130 Cal.Rptr.3d 1] (*Ardoin*).) Because Quiroz was charged with murder as a principal, he received adequate notice under California law.

A criminal defendant also has a federal constitutional right to " 'be informed of the nature and cause of the accusation.' " (*Gray v. Raines* (9th Cir. 1981) 662 F.2d 569, 571.) It is unsettled whether California's short-form pleading practice, without more, confers constitutionally adequate notice of the People's decision to proceed on an implicitly charged alternative legal theory. (Compare *People v. Scott* (1991) 229 Cal.App.3d 707, 716–717 [280 Cal.Rptr. 274] [holding it does] with *People v. Lucas* (1997) 55 Cal.App.4th 721, 737–738 [64 Cal.Rptr.2d 282] (*Lucas*) [holding it may not].) Nevertheless, we have deemed notice of a new theory to be constitutionally sufficient when the defendant is further alerted to the theory by the evidence presented at the preliminary hearing (*Scott, supra*, at p. 717; *People v. Jenkins* (2000) 22 Cal.4th 900, 1024 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*)), or by the People's express mention of that theory before or during trial sufficiently in advance of closing argument (*People v. Crawford* (1990) 224 Cal.App.3d 1,

8–9 [273 Cal.Rptr. 472] [initial, pretrial instructional conference]; *Lucas, supra,* at p. 738 [same]; *Stephens v. Borg* (9th Cir. 1995) 59 F.3d 932, 936 [five days prior to closing argument]). What due process will not tolerate is the People affirmatively misleading or ambushing the defense with their theory. (See *Sheppard, supra,* 909 F.2d at p. 1238; *U.S. v. Gaskins* (9th Cir. 1988) 849 F.2d 454, 458 (*Gaskins*); *Suniga v. Bunnell* (9th Cir. 1993) 998 F.2d 664, 667, overruled by *Hedgpeth v. Pulido* (2008) 555 U.S. 57 [172 L.Ed.2d 388, 129 S.Ct. 530, 532]; *Ardoin, supra,* 196 Cal.App.4th at p. 134.)

The People submitted an aiding and abetting instruction as part of their proposed jury instructions early on—during voir dire. The prosecutor explicitly renewed his request for that instruction at the initial charging conference five days before closing argument, and while Quiroz was still presenting his case. Indeed, the defense called six more witnesses *after* that charging conference. Quiroz had more than sufficient notice of the People's intention to proceed on an aiding and abetting theory. Furthermore, because the People in no way ambushed Quiroz with their aiding and abetting theory, *Sheppard* is distinguishable. (See *Lucas, supra,* 55 Cal.App.4th at p. 738 [confining *Sheppard* to its facts].)

Any late notice is harmless in any event. *Sheppard* adopted a rule of automatic reversal because the state's "ambush" had effectively denied Sheppard the assistance of counsel. (*Sheppard, supra,* 909 F.2d at pp. 1237–1238.) By contrast, in cases where a new theory is introduced late in the game for reasons other than prosecutorial gamesmanship, courts have employed a harmless error test. That test looks to whether the late notice "unfairly prevented [defense counsel] from arguing his or her defense to the jury or . . . substantially misled [counsel] in formulating and presenting arguments." (*Gaskins, supra,* 849 F.2d at p. 458; see *People v. Bishop* (1996) 44 Cal.App.4th 220, 234 [51 Cal.Rptr.2d 629].) *Gaskins* and *Bishop* applied this test to evaluate whether supplemental instructions responding to jury notes prejudiced the defendant. However, we find their approach appropriate here as well. Otherwise, we would be left with the illogical result that reversal of a conviction would be automatic when a new theory is added *before* closing argument, but not *after*.

Quiroz had ample time to call witnesses and tailor his closing argument after the People reaffirmed their request for an aiding and abetting instruction. Indeed, Quiroz capitalized on the People's midtrial shift in emphasis during his closing argument. Any late notice was therefore also harmless.

## II. *Identification of the Principal*

Quiroz also argues that an aiding and abetting instruction may not be given unless and until the People produce sufficient evidence of the identity of the

principal. Quiroz reasons that the jury cannot assess whether the aider and abettor shares the principal's intent unless it names the principal. We independently review the legal requirements of aiding and abetting liability. (*People v. Rolon* (2008) 160 Cal.App.4th 1206, 1212 [73 Cal.Rptr.3d 358].)

On occasion, courts have observed that an aider and abettor must act with the same "specific intent" as the principal. (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318]; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117–1118 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; see *People v. Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) However, these cases are always careful to note that they are referring to the requirement of aiding and abetting liability that the aider and abettor know the principal's purpose and intend to encourage or aid that purpose.

No court has required a specific perpetrator to be identified. Quiroz directs us to *People v. Singleton* (1987) 196 Cal.App.3d 488 [241 Cal.Rptr. 842]. In *Singleton*, the court overturned a conviction for aiding and abetting a drug offense because there was a "total absence of any proof of a perpetrator." (*Id.*, at p. 493.) *Singleton* stands for the unremarkable proposition that there can be no aider and abettor without a principal; it says nothing about whether a specific person must be identified as the principal.

Nor will we create such a requirement now. If we did so, we would effectively preclude aiding and abetting liability in those cases in which it is unclear which of several persons involved in a crime was the perpetrator, but equally clear that those persons acted together in committing the crime.

This case illustrates why Quiroz's novel proposal is unnecessary and unwise. No one disputes that someone shot Szostek. Moreover, the People presented sufficient evidence that this perpetrator—whoever he was—acted with premeditation. The evidence showed that one or more people who drove with Szostek in the Pontiac knew he was an informant, shot Szostek four times while he was still in the backseat, dumped him in an alley, and subsequently concealed the damage to the car. Quiroz hypothesizes that Szostek could have been shot impulsively, but this speculation does not undermine the substantial evidence that the shooter acted with premeditation. More to the point, we are able to make this assessment regarding the principal's intent without knowing which of the Pontiac's three other occupants pulled the trigger. Requiring the People to name a principal is accordingly unnecessary. It is also unwise because Quiroz's proposal would compel us to conclude that no one could be held liable for Szostek's murder, despite the evidence that his murder was premeditated.

### III. *Unanimity*

Quiroz further argues that the trial court was obligated to give a unanimity instruction. This instruction would have required all 12 jurors to agree on whether Quiroz was the shooter or a person who aided and abetted the shooter. Quiroz argues that the United States Supreme Court's decisions in *Apprendi, supra,* 530 U.S. 466, and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] (*Ring*) refused to defer to legislative labels. Quiroz reasons that, because our Legislature chose to classify aiding and abetting as an alternative theory of liability rather than a separate crime, *Apprendi* requires us to reject the Legislature's classification and to insist upon unanimity. Quiroz did not request a unanimity instruction, but we may overlook this forfeiture because he is now arguing that the trial court is under a sua sponte duty to instruct. (*People v. Valdez* (2012) 55 Cal.4th 82, 151 [144 Cal.Rptr.3d 865, 281 P.3d 924].) We consider this issue de novo. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 850 [128 Cal.Rptr.3d 565].)

■ For decades now, California law has conditioned the duty to give a unanimity instruction on whether the evidence at trial indicates that the defendant committed more than one " 'discrete criminal event.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1134–1135 [108 Cal.Rptr.2d 436, 25 P.3d 641] (*Russo*).) Where the evidence suggests that the defendant might have committed more than one crime, the court must instruct the jury that it must agree on *which* of the acts—and, hence, which of the *crimes*—the defendant committed. (See *People v. Diedrich* (1982) 31 Cal.3d 263, 281 [182 Cal.Rptr. 354, 643 P.2d 971]; *People v. Napoles* (2002) 104 Cal.App.4th 108, 118–119 [127 Cal.Rptr.2d 777].) Otherwise, a guilty verdict might not reflect that all 12 jurors agreed that the defendant committed the same crime. (*People v. Beardslee* (1991) 53 Cal.3d 68, 92 [279 Cal.Rptr. 276, 806 P.2d 1311] (*Beardslee*) ["A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses."].)

Where, however, the evidence suggests that a defendant committed only one discrete criminal action—but may have done so in one of several different ways—no unanimity instruction is required. (*Russo, supra,* 25 Cal.4th at p. 1135; *People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990] ["It is settled . . . that unanimity as to the theory under which a killing is deemed culpable is not compelled as a matter of state or federal law."].) Unanimity is not required in this situation even if the jurors might conclude that the defendant is guilty based on different facts, or on different findings about the acts the defendant committed or his mental state. (*Jenkins, supra,* 22 Cal.4th at pp. 1025–1026; *People v. Pride* (1992) 3 Cal.4th 195, 249–250 [10 Cal.Rptr.2d 636, 833 P.2d 643] (*Pride*); *People v. Davis* (1992) 8 Cal.App.4th 28, 45 [10 Cal.Rptr.2d 381].) That is because, in this situation,

the jury's guilty verdict will still reflect unanimous agreement that the defendant committed a single crime.

█ On the basis of this authority, California courts held that a unanimity instruction is not required as to which overt act was committed in furtherance of a conspiracy (*Russo, supra,* 25 Cal.4th at pp. 1135–1136); which felony the defendant intended to commit when burglarizing a house (*People v. Failla* (1966) 64 Cal.2d 560, 567–569 [51 Cal.Rptr. 103, 414 P.2d 39]); which acts constitute lying in wait for a murder conviction (*People v. Edwards* (1991) 54 Cal.3d 787, 824 [1 Cal.Rptr.2d 696, 819 P.2d 436]); or which aggravating factors render the defendant eligible for the death penalty (*People v. Cook* (2006) 39 Cal.4th 566, 618–619 [47 Cal.Rptr.3d 22, 139 P.3d 492]).

For the same reasons, California courts have also held that a jury need not agree on the legal theory underlying a single murder charge. This rule applies whether the choice is between premeditated murder and felony-murder theories (*Beardslee, supra,* 53 Cal.3d at pp. 92–93; *Ardoin, supra,* 196 Cal.App.4th at pp. 126–127; *Pride, supra,* 3 Cal.4th at pp. 249–250), or between direct liability and aiding and abetting liability theories (*People v. Wilson* (2008) 44 Cal.4th 758, 801–802 [80 Cal.Rptr.3d 211, 187 P.3d 1041]; *Jenkins, supra,* 22 Cal.4th at pp. 1025–1026; *People v. Majors* (1998) 18 Cal.4th 385, 408 [75 Cal.Rptr.2d 684, 956 P.2d 1137] (*Majors*); *People v. Santamaria* (1994) 8 Cal.4th 903, 918–919 [35 Cal.Rptr.2d 624, 884 P.2d 81]; *People v. Forbes* (1985) 175 Cal.App.3d 807, 816–817 [221 Cal.Rptr. 275]; *People v. Perez* (1993) 21 Cal.App.4th 214, 220–222 [26 Cal.Rptr.2d 691]).

The United States Supreme Court has declared this approach to defining when unanimity instructions are required to be consistent with the requirements of due process. In *Schad v. Arizona* (1991) 501 U.S. 624 [115 L.Ed.2d 555, 111 S.Ct. 2491], the court upheld an Arizona law which, like California law, treated premeditation and felony murder as alternative theories upon which a person could be convicted of murder. Arizona accordingly did not require juror unanimity. The court explained that due process placed some limits "on a State's capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense . . . ." (*Id.,* at p. 632.) However, the court held that Arizona's decision to treat premeditated murder and felony murder as different theories rather than different offenses did not exceed those limits. The court therefore upheld Arizona's decision not to require unanimity as to which theory the jurors adopted. (*Id.,* at pp. 636–638.) Because these rules did not violate due process, "[j]udicial restraint" counseled against gainsaying Arizona's approach. (*Ibid.*)

Do *Apprendi* and *Ring* undermine *Schad* and thereby compel a change in our approach to jury unanimity? The specific holdings of *Apprendi* and *Ring*

do not. In each case, the court held that due process required any facts triggering a higher maximum penalty for a crime to be found by the jury beyond a reasonable doubt. (*Apprendi, supra,* 530 U.S. at pp. 490, 494 [longer jail term]; *Ring, supra,* 536 U.S. at pp. 589, 603–604 [imposition of death penalty].) The court further held that states could not sidestep this constitutional requirement by labeling such facts "sentencing factors" rather than elements. (*Apprendi,* at pp. 490, 494; *Ring,* at pp. 589, 603–604.) Because the choice between alternative theories does not in any sense trigger a higher maximum penalty, these cases do not themselves abrogate *Schad* or require us to modify our approach to juror unanimity.

Nor do the rationales of *Apprendi* or *Ring* dictate or counsel any change. Contrary to what Quiroz asserts, *Apprendi* and *Ring* did not decree a wholesale abandonment of deference to how states define their crimes. To the contrary, these two cases reaffirmed *Schad*'s deference to the authority of states to delineate crimes. They also embraced *Schad*'s reluctance to discard state law labels except when compelled by constitutional necessity. As we note above, the rights at issue in *Apprendi* and its progeny do not create such necessity in this case. Moreover, Quiroz has not identified any other constitutional right at issue here that would justify overriding California's long-standing authority to treat direct liability and aiding and abetting liability as alternative legal theories rather than as two separate crimes. Absent a superseding constitutional right, we would be disregarding deference to state law just for the sake of doing so. *Apprendi, Ring* and *Schad* speak in a uniform voice in decrying such judicial activism.

Given this dynamic, it is no surprise that courts have not read *Apprendi* as vitiating California's authority to distinguish between alternative theories and separate crimes, and to insist upon unanimity only for separate crimes. Following *Apprendi,* numerous cases have reaffirmed the rule that a jury need not unanimously agree whether the defendant committed premeditated murder or felony murder. (*People v. Moore* (2011) 51 Cal.4th 386, 413 [121 Cal.Rptr.3d 280, 247 P.3d 515]; *People v. Taylor* (2010) 48 Cal.4th 574, 626 [108 Cal.Rptr.3d 87, 229 P.3d 12]; *People v. Nakahara* (2003) 30 Cal.4th 705, 712–713 [134 Cal.Rptr.2d 223, 68 P.3d 1190].)

This is the first case to squarely confront *Apprendi*'s application to the alternative theories of direct and aiding and abetting liability. Quiroz argues that these alternative theories are different from the alternative theories of premeditation and felony murder because a jury choosing between the theories of felony murder and premeditation will still have to unanimously agree on what the defendant did. But this is not always true. In *Perez,* for example, the defendant was alternatively charged with felony murder and premeditation on theories entailing two entirely different factual scenarios.

(*Perez, supra*, 21 Cal.App.4th at pp. 217–222.) He could have been either the getaway driver or the shooter inside the store, yet unanimity was not required. (*Ibid.*) We therefore see no principled basis upon which to require unanimity for direct liability versus aiding and abetting liability, but not for premeditated versus felony-murder liability.

Reading *Apprendi* to require unanimity for alternative theories would jettison decades of precedent and, at the same time, abrogate deference to state legislators' definitions of crimes without any constitutional imperative. It would also lead to absurd results: As our Supreme Court has noted, " '[i]f 12 jurors must agree on the role played by the defendant, the defendant may go free, even if the jurors all agree [he] committed the crime.' " (*Russo, supra*, 25 Cal.4th at p. 1136.) We therefore conclude that *Apprendi* and *Ring* have not altered existing law, and the trial court ruled properly in not giving a unanimity instruction in this case.

## IV. *Remaining Instructional Challenges*

### A. *Substantial evidence to support aiding and abetting instruction*

■ Quiroz argues that the trial court should have refused to give the aiding and abetting instruction because substantial evidence did not support a finding that he knew of the shooter's intent to kill or that Quiroz intended to aid the shooting. (*People v. Beeman, supra*, 35 Cal.3d at p. 560; *People v. Perez* (2005) 35 Cal.4th 1219, 1225 [29 Cal.Rptr.3d 423, 113 P.3d 100].) A trial court may instruct on a theory only if it is supported by "substantial evidence." (*People v. Young* (2005) 34 Cal.4th 1149, 1200–1201 [24 Cal.Rptr.3d 112, 105 P.3d 487].) We review the trial court's assessment de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

Substantial evidence supports the trial court's decision to instruct on aiding and abetting liability. The evidence adequately demonstrated Quiroz's awareness and complicity in Szostek's killing. Quiroz spoke with Flores about Szostek's role in bringing down Flores's drug organization; Quiroz borrowed the Pontiac and picked up Szostek on the night of his death; Quiroz may have been present in the car at the time Szostek was shot; Quiroz showed up unbidden at the home of the woman who picked up Szostek's body just hours after the shooting; also just hours after the shooting, Quiroz was driving around in the Pontiac with one of the witnesses to the shooting; Quiroz cleaned up the Pontiac, returned it to its owner, and advised the owner to "lay low"; and Quiroz admitted to the shooting and knowing many of its details to two fellow inmates.

B. *Accessory instruction*

■ Quiroz also asserts that the trial court erred in not instructing the jury that his postshooting conduct was insufficient, by itself, to convict him of aiding and abetting. Quiroz never requested such an instruction prior to closing argument. To the extent Quiroz argues that the trial court was obligated to instruct the jury on the crime of being an accessory after the fact, he is incorrect because doing so would have been error in light of the People's objection. (*Majors, supra,* 18 Cal.4th at p. 408 [accessory after the fact is a lesser *related* offense of murder]; *People v. Birks* (1998) 19 Cal.4th 108, 137 [77 Cal.Rptr.2d 848, 960 P.2d 1073] [court may not instruct on lesser *related* offenses unless all parties agree].) To the extent Quiroz is arguing that the court should have given a pinpoint instruction clarifying the differences between an aider and abettor and an accessory after the fact, any such instruction would have been duplicative and unwarranted. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99 [17 Cal.Rptr.3d 710, 96 P.3d 30].) The aiding and abetting instruction already informed the jury that Quiroz had to have the intent to aid and abet the killing "before or during the commission of the offense"; as long as Quiroz satisfied this intent require-ment, even his post-killing acts would render him an aider and abettor. (See *People v. Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742].)

## V. Evidentiary Challenges

A. *Statement of Ruben Gonzales (Gonzales)*

### 1. Pertinent facts

Gonzales was a defense witness. He testified that Quiroz was not in the Pontiac when Szostek was shot. Quiroz's counsel asked Gonzales about a prior statement Gonzales made to police. In response to counsel's specific questions about the circumstances under which Gonzales made that state-ment, Gonzales indicated that the police had told him that he could cooperate or face 50 years to life in prison and that they knew all the answers, including that Quiroz was in the Pontiac at the time of the shooting.

In rebuttal, the People called one of the detectives who had interviewed Gonzales. The detective relayed the substance of Gonzales's statement—namely, that Quiroz had been in the Pontiac, and had told Gonzales to keep quiet about the shooting. The detective also described the circumstances of Gonzales's two-hour interview. Gonzales had not been under arrest. The detective and other officer gave Gonzales the information they believed to be true, told Gonzales that they knew he was not the shooter, and told him he

was still potentially liable for the murder. They explained that Gonzales faced 50 or more years in prison, but could provide them accurate information that the district attorney might view favorably. The officers also told Gonzales that Quiroz and others were talking to the police, which was untrue.

### 2. *Analysis*

Quiroz argues that the trial court should have excluded Gonzales's statement as coerced. Because he is seeking to suppress Gonzales's statement (and not his own), Quiroz bears the burden of proving the statement was coerced. (*People v. Badgett* (1995) 10 Cal.4th 330, 348 [41 Cal.Rptr.2d 635, 895 P.2d 877].) We review this question de novo. (*People v. Richardson* (2008) 43 Cal.4th 959, 992–993 [77 Cal.Rptr.3d 163, 183 P.3d 1146].)[2]

Quiroz has forfeited this claim by failing to object below. (*People v. Kennedy* (2005) 36 Cal.4th 595, 611–612 [31 Cal.Rptr.3d 160, 115 P.3d 472] [failure to object to admission of involuntary statement forfeits issue on appeal], disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459 [111 Cal.Rptr.3d 589, 233 P.3d 1000]; *People v. Kelly* (1992) 1 Cal.4th 495, 519 & fn. 5 [3 Cal.Rptr.2d 677, 822 P.2d 385] [casting significant doubt on *In re Cameron* (1968) 68 Cal.2d 487 [67 Cal.Rptr. 529, 439 P.2d 633], which heard a challenge to a confession as involuntary despite its forfeiture].) Because the question of coercion turns on the intensely factual inquiry into the totality of the circumstances (*People v. Dykes* (2009) 46 Cal.4th 731, 752 [95 Cal.Rptr.3d 78, 209 P.3d 1]), it is an especially poor candidate for first-time consideration on appeal. (Accord, *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1325 [139 Cal.Rptr.3d 686].)

Quiroz argues we should nevertheless consider his claim because his trial counsel was constitutionally ineffective for not objecting and there is "no satisfactory explanation" for counsel's lapse. (*People v. Huggins* (2006) 38 Cal.4th 175, 206 [41 Cal.Rptr.3d 593, 131 P.3d 995].) We disagree. Quiroz's trial counsel did more than not object—he called Gonzales as a witness and, during his direct examination, elicited facts about the alleged coerciveness of the earlier police interrogation. What is more, counsel then used those facts in his closing argument to make the point that the police were coercing statements from Gonzales and others to fit their theory that Quiroz was the shooter. Counsel's decision to call Gonzales and elicit these facts in the service of his closing argument is a classic tactical decision. It defeats any contention that counsel was asleep at the switch or otherwise ineffective. (See *Strickland v. Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

---

[2] We would evaluate the trial court's resolution of any evidentiary disputes for substantial evidence (*People v. Richardson, supra*, 43 Cal.4th at pp. 992–993), except that we have no such findings because Quiroz never asked the court to make them.

█ In any event, Gonzales's interrogation did not transgress the guidelines that govern police interrogations. It is well settled that law enforcement may confront a witness with what they know. (*People v. Holloway* (2004) 33 Cal.4th 96, 115 [14 Cal.Rptr.3d 212, 91 P.3d 164].) They may also discuss any advantages that " 'naturally accrue' " from making a truthful statement. (*People v. Ray* (1996) 13 Cal.4th 313, 340 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Jones* (1998) 17 Cal.4th 279, 297–298 [70 Cal.Rptr.2d 793, 949 P.2d 890].) They may explain the possible consequences of the failure to cooperate as long as their explanation does not amount to a threat contingent upon the witness changing her story. (*People v. McClary* (1977) 20 Cal.3d 218, 228–229 [142 Cal.Rptr. 163, 571 P.2d 620], overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) They may even engage in deception as long as it is not of a type "reasonably likely to produce an untrue statement." (*People v. Scott* (2011) 52 Cal.4th 452, 481 [129 Cal.Rptr.3d 91, 257 P.3d 703] (*Scott*).)

Quiroz points out that Gonzales may have been unlawfully "seized" in violation of the Fourth Amendment or in "custody" for purposes of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]. These observations are irrelevant. Seizure and "custody" hinge on *objective* inquiries. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400 [58 Cal.Rptr.3d 368, 157 P.3d 973]; *People v. Hughes* (2002) 27 Cal.4th 287, 328 [116 Cal.Rptr.2d 401, 39 P.3d 432].) They add nothing to the *subjective* inquiry that defines coercion under due process. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1133 [124 Cal.Rptr.2d 373, 52 P.3d 572].)

Nor does Gonzales's interrogation suffer from the same flaws as the interrogation in *People v. Lee* (2002) 95 Cal.App.4th 772 [115 Cal.Rptr.2d 828]. In *Lee*, the police falsely told the witness that the lie detector test he took indicated he was guilty with 97 percent accuracy and threatened him with a murder charge unless he named the defendant. The vice in *Lee* was that the interrogation "was not designed to produce the truth as [the witness] knew it but to produce evidence to support a version of events the police had already decided upon." (*Id.*, at p. 786.) Quiroz did not establish the same or any similar dynamic here.

B. *Quiroz's jailhouse statement to Ismael Cano*

1. *Pertinent facts*

In January 2006, jail officials moved Quiroz into a cell beside Ismael Cano (Cano). They told Quiroz the move was for security reasons—namely, that the Mexican Mafia had ordered a "hit" on Quiroz. In truth, they moved him to be near Cano, a jailhouse informant. Cano told Quiroz that he was part of

Flores's drug organization (which was true) and was Flores's cousin (which was untrue). Cano explained that Flores's drug operation had been dismantled by the Drug Enforcement Administration, due in large part to a few snitches. At that point, Quiroz indicated that he shot "Brian." An officer listening in on their conversation also heard Quiroz admit to the shooting, but did not hear Quiroz use the same words Cano heard to describes.

## 2. *Analysis*

Quiroz contests the admission of his incriminating statements to Cano. Because Quiroz raises this objection for the first time on appeal, it is forfeited. It is also without merit.

Quiroz argues that three aspects of his statement render it involuntary: (1) Quiroz faced a credible threat of physical violence because he was told he was moved to a different cell for safety reasons; (2) the prison officials lied about why he was moved and Cano lied about being Flores's cousin; and (3) Cano made an indirect offer to call off Flores's organization if Quiroz confessed to killing Szostek. This situation, Quiroz claims, is indistinguishable from the confession held to be involuntary in *Arizona v. Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 111 S.Ct. 1246] (*Fulminante*).

To begin with, the factors Quiroz cites do not amount to coercion on the record we have before us. Although the jail officials moved Quiroz because of an alleged "threat" of a hit, there is no evidence that Quiroz had any reason to believe those threats originated with Flores. Moreover, the two deceptions involved—(1) that the prison officials did not honestly tell Quiroz he was being moved so Cano could try to surreptitiously befriend him and elicit incriminating statements and (2) that Cano exaggerated his connection to Flores (as a cousin rather than business associate)—are not of the type "reasonably likely to produce an untrue statement." (*Scott, supra*, 52 Cal.4th at p. 481.) Additionally, the evidence does not support Quiroz's contention on appeal that Cano suggested he would call off the Mexican Mafia hit on Quiroz if Quiroz admitted killing Szostek. To the contrary, the thrust of Cano's ploy was that Flores would be grateful to whoever had eliminated Szostek. Consequently, the undercover conversations in this case are unlike those in *Fulminante*, where the informant promised to protect the defendant from ongoing jailhouse violence against him only if he confessed to murder. (*Fulminante, supra*, 499 U.S. at pp. 287–288.)

## *DISPOSITION*

The judgment is affirmed.

Gilbert, P. J., and Perren, J., concurred.

A petition for a rehearing was denied May 1, 2013, and appellant's petition for review by the Supreme Court was denied July 10, 2013, S210679.