Filed 9/7/16  P. v. Lopez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE ARISTIDES LOPEZ,<br><br>    Defendant and Appellant. | B267082<br><br>(Los Angeles County<br>Super. Ct. No. BA393896) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie A. Swain, Judge.  Affirmed.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Chung L. Mar and Abtin Amir, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted appellant Jose Aristides Lopez of first degree murder, and found the crime was committed for the benefit of a criminal street gang. (Pen. Code, §§ 187, subd. (a); 186.22, subd. (b).)[1] On appeal, Lopez argues the trial court erred in giving aiding and abetting instructions during jury deliberations, in response to a jury question. We affirm.

## FACTS

### Background

A few years after immigrating to this country, Brian Dieguez was "jumped in" as a member of the Harvard Criminal clique of the Mara Salvatrucha criminal street gang, also known as MS-13. The Harvard Criminal clique of MS-13 and the Hollywood Locos clique of MS-13 have a long, "special relationship." Dieguez and other MS-13 gang members "jumped in" Lopez when he became a member of the Hollywood Locos. Dieguez knew Lopez as "Solo" or "Sapo."

MS-13 and the 18th Street gang have been involved in a long, bitter rivalry for many years, and are "at war," both locally and throughout Central and South America. As explained by Dieguez at trial, if he or another MS-13 gang member saw an 18th Street gang member on the street, he would—without saying anything—kill the 18th Street gang member if he had a gun, or fight him if he was unarmed.

### The Shooting

During the afternoon of January 11, 2010, Dieguez and two other MS-13 gang members, Temper[2] and Listo, were drawing graffiti when a group from a rival gang drove up and insulted them, and the two groups exchanged gunfire.[3] After the confrontation, Dieguez, Temper and Listo went to a friend's house where they met up with Lopez and other MS-13 gang members. Lopez told his fellow gang members that he knew the

---

[1] All undesignated section references are to the Penal Code.

[2] Dieguez identified Temper as the "shot caller" for the Harvard Criminals.

[3] According to Dieguez, Listo had the gun that was fired for the Harvard Criminals; he did so at the direction of Temper and Dieguez.

location of "a guy . . . who belonged to 18," and suggested, "Let's go hit him," meaning "Let's go kill him."[4] Listo gave the gun he had to Lopez.

Lopez, Dieguez, and Listo went to a bakery where the murder victim, William Zambrana, worked as a security guard. When Lopez and the other MS-13 gang members arrived at the bakery, Dieguez saw a friend's car parked outside. Dieguez decided to go inside to warn his friend that Dieguez and others were "going to hit somebody" right then, and that his friend should "[h]urry up and leave."[5] As Dieguez walked into the bakery to warn his friend, he saw Lopez walking toward the parking lot area where Zambrana was standing.

At about 8:00 p.m. on January 11, 2010, Zambrana was on security guard duty in a uniform in the parking lot in front of the bakery.[6] Just before the shooting, Zambrana was facing away from the bakery when he got a feeling that he should turn around. When he turned around, he saw Lopez walking towards him, about three feet away, and pointing a revolver at him with his finger on the trigger. Zambrana knew he had only "a short time" to try to stop Lopez from shooting him, and grabbed for the gun in Lopez's hand. As the two men struggled, Lopez tried to point the gun at Zambrana's head. Ultimately, Lopez fired a shot that struck Zambrana in the arm. Zambrana started "losing

---

[4]    The previous day, Lopez had gotten into an argument with a person outside the front of the bakery, and the murder victim, William Zambrana, had asked Lopez to calm down because his yelling could be heard inside the bakery. During the encounter, Lopez yelled that he did not "give a shit" about Zambrana, and did not care that Zambrana was a security guard. Zambrana was in his mid 40s; he had been a member of the 18th Street gang when he was young man. Although he had not been active in the gang for at least 20 years, he still had a visible 18th Street gang tattoo on his pinky.

[5]    At trial, the prosecution showed a surveillance video of the inside of the bakery. The video showed a person walking up and saying something to a person in a white hat. Dieguez identified himself as the person who spoke to the person in the white hat.

[6]    Zambrana died from his gunshot wounds after testifying at Lopez's preliminary hearing. His preliminary hearing testimony was read into the record at Lopez's trial. The facts describing the shooting largely come from Zambrana's testimony at the preliminary hearing.

3

a lot of blood," which caused him to lose strength and start to fall. Lopez then fired a second shot that entered Zambrana's neck. The second shot severed Zambrana's spinal cord, rendering him quadriplegic. As noted above, Zambrana died from complications of this gunshot wound before Lopez's trial.

After the shooting, Lopez went the home of another MS-gang member, Feris "Smiley" Calderon. Lopez stated that he had just shot a security guard from the 18th Street gang at a bakery. Further, Lopez stated that he got the gun from Listo. Lopez said he knew the victim was a member of the 18th Street gang because of a tattoo on his hand. At an MS-13 gang meeting the next day, Calderon heard Lopez announce that he shot a security guard from the 18th Street gang the day before. Lopez showed fellow members of the gang a .38 revolver that he said he had used to do the shooting.[7]

### The Criminal Case

In February 2013, the People filed an information jointly charging Lopez and Dieguez with murder. (§ 187, subd. (a).) Further, the information alleged as to Lopez that he had personally discharged a firearm causing death (§ 12022.53, subd. (d)), that a principal had discharged a firearm causing death (§ 12022.53, subds. (d) & (e)(1)), and that the murder had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)). In September 2014, Dieguez signed a "cooperation agreement" with the District Attorney's Office. Under the terms of the agreement, Dieguez agreed to plead guilty to voluntary manslaughter with a 21 year sentence in exchange for his truthful testimony at trial against Lopez and in three other cases in which he had not been accused.

In summer 2015, the charge and allegations against Lopez were tried to a jury, and the prosecution presented evidence establishing the facts summarized above. Lopez did not present any defense evidence; his counsel argued that Zambrana's testimony could

---

[7] Calderon's testimony from Lopez's preliminary hearing was also read into the record at Lopez's trial. When members of the MS-13 gang heard that Calderon had testified at the preliminary hearing, they carved a MS-13 tattoo out of the skin on his hand while he was in custody. Before Lopez's trial, Calderon was deported; he refused to return to the United States to testify for fear of reprisal from the MS-13 gang.

not be found credible because of the stress and excitement of the shooting, and that the testimony of the prosecution's gang member witnesses was not credible in that they were looking out for themselves. Initially, the trial court instructed the jury on first degree murder, second degree murder and voluntary manslaughter based on imperfect self-defense. Further, the court instructed on the allegation that Lopez personally used and discharged a firearm causing death. Verdict sheets were given to the jury accordingly. During the first day of deliberations, the court gave supplemental instructions on aiding and abetting, and allowed further argument on the issue of criminal liability as an aider and abettor. The supplemental instructions are discussed below. Ultimately, the jury returned a verdict finding Lopez guilty of willful, deliberate and premeditated murder, with a finding that the murder had been committed for the benefit of a criminal street gang. The jury found the personal use of a firearm allegation not true.

The trial court sentenced Lopez to a term of 25 years to life on his first degree murder conviction. The court ordered the jury's gang benefit finding stayed.

## DISCUSSION

Lopez contends the trial court erred in giving aiding and abetting instructions for the first time in response to a jury question during deliberations. We disagree.

### *The Trial Circumstances*

The prosecutor argued to the jury that the evidence showed that Lopez was the shooter, and that the jury's duty was to decide "what type of homicide this is." The prosecutor conceded that "[a]n acquittal will obviously be if you believe he's not the shooter." Defense counsel argued that Zambrana's testimony should not be accepted as proof beyond a reasonable doubt because of the stress of the shooting events, and that the other two gang member witnesses who implicated Lopez, namely, Dieguez and Calderon, were "dirt bags" and "scum bags" whose testimony also should not be accepted. The trial court then instructed the jury on murder, including first and second degree murder, and voluntary manslaughter based on imperfect self-defense. Further, the court instructed on the allegation that Lopez personally used and discharged a firearm causing death. The instructions did not cover the subject of criminal liability based on aiding and

5

abetting. At 2:45 p.m., on July 31, 2015, a Friday, the court ordered the bailiff to take charge of the jury, and continued the proceedings to Monday morning, August 3, 2015. The jury began deliberations at 9:40 a.m. on Monday, August 3, 2015.

At 2:10 p.m. that day, the jury submitted a note and the trial court informed the lawyers that the court had received a note from the jury asking the following question: "If we believe that 'Solo' [appellant] was there and not the trigger man—can we still find him guilty?'" The court solicited responses from the lawyers as to "how [they thought] the court should proceed."

After hearing a series of exchanges between defense counsel (advocating that aiding and abetting instructions should not be given) and the prosecutor (advocating that aiding and abetting instructions should be given), the trial court ruled as follows:

"All right. I think under the circumstances it would be improper for the court to write back and say that the answer is 'no.' I just don't feel as though that's a correct statement of the law under the circumstances. The jury has invited the court to steer them on this matter and I believe that the correct way to do that would be to provide the jury instructions which the court would have given had this been requested or had the court considered it a sua sponte responsibility, which I don't know if it is or it isn't. [¶] But at this point I believe it's appropriate to instruct on aiding and abetting."

The trial court told defense counsel that he could "have as much time as [he] want[ed]" to prepare his argument and to argue the matter to the jury. The court granted defense counsel's request to end the trial day early to allow him time to prepare his argument on aiding and abetting the next day.

The following day, the trial court instructed the jury on aiding and abetting using CALCRIM Nos. 400 and 401, and the prosecutor and defense counsel argued for and against finding Lopez guilty under an aiding and abetting theory of liability. The prosecutor pointed to evidence that implicated Lopez as an aider and abettor, including encouraging MS-13 members to kill Zambrana, then accompanying and supporting them during the commission of the crime. Further, the prosecution reminded the jurors that

6

Dieguez, a former codefendant, had pled guilty to aiding and abetting Lopez in the shooting. Defense counsel argued that the prosecution's witnesses were unreliable, and that there was no credible evidence that Lopez was present or participated in the shooting.

***The Governing Law***

Under California criminal law pleading practice, a defendant may be convicted as an aider and abettor "'without the accusatory pleading reciting the aiding and abetting theory'" so long as defendant is charged in the pleading as a principal to the substantive offense and thus receives notice of the charge against him. (*People v. Garrison* (1989) 47 Cal.3d 746, 776, fn. 12 (*Garrison*), quoting *People v. Greenberg* (1980) 111 Cal.App.3d 181, 188.) This said, a defendant has a due process right to notice of the prosecution's theory of a case, and not to be affirmatively misled or "ambushed" in preparing and presenting his or her defense. (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 70-71 (*Quiroz*).) Notice of a new theory of criminal liability raised for the first time at trial is "constitutionally sufficient when the defendant is . . . alerted to the theory by the evidence presented at the preliminary hearing . . . or by the People's express mention of that theory before or during trial sufficiently in advance of closing argument . . . ." (*Quiroz, supra,* 215 Cal.App.4th at pp. 70-71, citing *People v. Jenkins* (2000) 22 Cal.4th 900, 1024; *People v. Scott* (1991) 229 Cal.App.3d 707, 717; *People v. Crawford* (1990) 224 Cal.App.3d 1, 8-9, and similar cases.)

In *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234, the Ninth Circuit applied "a rule of automatic reversal" upon finding that a prosecutor's "ambush" trial tactics "effectively denied [the defendant] the assistance of counsel." (*Quiroz, supra*, 215 Cal.App.4th at p. 71.) "By contrast, in cases where a new theory is introduced late in the game for reasons other than prosecutorial gamesmanship, courts have employed a harmless error test. That test looks to whether the late notice 'unfairly prevented [defense counsel] from arguing his or her defense to the jury or . . . substantially mislead [counsel] in formulating and presenting arguments.'" (*Quiroz, supra,* 215 Cal.App.4th at p. 71, quoting *United States v. Gaskins* (9th Cir. 1988) 849 F.2d 454, 458 (*Gaskins*), and also

7

citing *People v. Bishop* (1996) 44 Cal.App.4th 220, 234 (*Bishop*).) "*Gaskins* and *Bishop* applied this test to evaluate whether supplemental instructions responding to jury notes prejudiced the defendant." (*Quiroz*, at p. 71.) Inasmuch as Lopez's case here presents the same situation of supplemental jury instructions responding to a jury note, we too will apply the *Gaskins/Bishop* test.

*Analysis*

Lopez contends there was *Gaskins/Bishop* error in his case because he "was denied the opportunity to prepare and develop a defense" based on the prosecutor's "strategic decision" to "reject the giving of aiding and abetting instructions" and to focus "solely on the direct liability theory." In this vein, he postulates that the prosecutor planned to conceal his intent to prove an aiding and abetting theory of liability by arguing only a theory of direct liability until the last possible moment. We find no error for various reasons.

The initial problem with Lopez's *Gaskins/Bishop* error argument is that it imparts to the prosecutor the prescience to have known that the jury would ask its question to the trial court, thus giving the prosecutor an opening to pursue the "new" theory of aiding and abetting liability. If there had been no such jury question, then no aiding and abetting instructions would have been given. We cannot see how the prosecutor pursued a plan to spring an aiding and abetting theory at the last minute. Further, if the prosecutor employed the "strategy" that Lopez sees, the prosecutor would also have had to predict correctly that the trial judge would decide to give the aiding and abetting instructions in response to the jury's question, rather than accede to the defense's arguments not to give such instructions. For these reasons, the only reasonable reading of the record must lead to the conclusion that the prosecutor presented a direct liability theory to the jury because he was convinced that Lopez was the shooter and that the jury would agree, not that he was employing an ambush strategy to gain an advantage with a belatedly sprung new theory of criminal liability.

8

Second, we find the record does not support Lopez's contention that he did not have an "opportunity to develop . . . evidence" in support of a defense against the aiding and abetting theory. Plainly, the prosecution's trial evidence was intended to establish that Lopez was the shooter. But there was nothing in the prosecution's evidence which may be seen to have necessarily deterred Lopez from *developing evidence* showing that he had no involvement in the shooting at all, whether as the actual shooter or as an aider and abettor. Indeed, the substance of the argument that Lopez presented to the jury was that there was no credible evidence to support a finding that he was involved at all. We see no reason, based on the prosecution's evidence, that Lopez could not have buttressed his defense theory with further evidence. Plainly, Lopez had an opportunity to develop evidence that would have worked against an aiding and abetting theory in the same manner as it would against the direct shooter theory. The prosecution's evidence, specifically the testimony of Dieguez, showed that Lopez suggested the shooting, and suggested the target. Lopez's arguments do not explain how the motive and preparation of Lopez's trial counsel to develop evidence challenging Dieguez's testimony would have been different had an aiding and abetting theory been offered from the beginning of trial. We have not been persuaded by Lopez's arguments to conclude that the fact that the jury asked whether Lopez could be liable for murder even in the event he was not the actual triggerman, standing alone, shows that Lopez was "denied the opportunity to develop evidence" challenging an aiding and abetting theory. This is particularly true in light of Lopez's defense that he was not involved in the shooting at all.

Lopez argues his defense counsel reasonably chose not to "drill down in his cross-examination" of Dieguez because of the lack of notice "that alternative theory of liability was in issue." Here, Lopez contends his defense counsel reasonably chose not to cross-examine Dieguez about his testimony that Lopez "pinpointed the location of the enemy 18th Street member" and suggested they go kill him. The problem with Lopez's argument is that his defense strategy—throughout the trial, including both before and after the supplemental aiding and abetting instructions and during both the pre and post supplemental instructions arguments—was only to urge the jury to question the

credibility of the gang witnesses against him. As we have said, the defense strategy—from beginning to end—was consistently based on disproving any theory of liability, which would encompass aiding and abetting liability. Thus, defense counsel would have had the same incentive to cross-examine Dieguez's irrespective of the supplemental instructions, and there is no showing in the record to support the argument that the supplemental instructions had a prejudicial effect on Lopez's trial tactics or its implementation.

After reviewing the record in its entirety, including the events that occurred during jury deliberations and thereafter, we are not persuaded that Lopez was denied assistance of counsel, or that he was denied proper notice of, or a fair opportunity to respond to, his potential liability under an aiding and abetting theory. Accordingly, we find the trial court's supplemental instructions on the new theory were proper.

## DISPOSITION

The judgment is affirmed.

BIGELOW, P.J.

We concur:

FLIER, J.

RUBIN, J.

10