Filed 6/3/21  P. v. Glass CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CORNELL CAREY GLASS,<br><br>    Defendant and Appellant. | 2d Crim. No. B303432<br>(Super. Ct. No. MA074807)<br>(Los Angeles County) |

Cornell Carey Glass appeals from the judgment after he was convicted in a court trial of two counts of home invasion robbery (counts 1 and 2; Pen. Code,[1] §§ 211, 213, subd. (a)(1)(A)), assault with a firearm (count 5; § 245, subd. (a)(2)), and battery with serious bodily injury (count 6; § 243, subd. (d)).  The court found true allegations that the crimes were committed to benefit a criminal street gang (counts 1, 2, 5, and 6; § 186.22, subd. (b)), use of a firearm (counts 1 and 2; § 12022.53, subds. (b) & (e)), and

---

[1] All subsequent undesignated statutory references are to the Penal Code.

being armed with a firearm (counts 5 and 6; § 12022, subd. (a)(1)).  The court also found true an allegation that all counts were committed while Glass was on bail (§ 12022.1).  The court struck allegations of a prior prison term (§ 667.5, subd. (b)).[2]

The trial court sentenced Glass to two consecutive indeterminate terms of 15 years to life for counts 1 and 2. (§ 186.22, subd. (b)(4)(B).)  The court stayed sentences of nine years each for counts 5 and 6 with gang and armed with firearm enhancements.  The court stayed sentencing for the on-bail enhancements pending disposition of the case for which he was on bail.

In written findings of fact and conclusions of law, the trial court stated that the section 12022.53 firearm enhancements as to counts 1 and 2 would be stricken.  At sentencing, however, the court enhanced the sentences for counts 1 and 2 by ten years each pursuant to subdivisions (c) and (e)(1) of section 12022.53, but ordered them stayed.

Glass contends:  (1) he was denied due process as to the robbery counts because the prosecution failed to provide notice of the aiding and abetting theory, (2) his counsel rendered ineffective assistance, and (3) the firearm use enhancements for robbery must be stricken.  We modify the judgment to strike the firearm use enhancements and otherwise affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

T.J., C.P., and C.S. robbed Z.W. and I.W. inside their home.  The trial court found that Glass, who remained outside,

---

[2] Glass was charged with, and convicted of, multiple counts arising from a separate incident during the same trial.  Because Glass does not challenge these convictions, we do not discuss them in this opinion.

was the getaway driver and was guilty as an aider and abettor.

Glass and the other suspects were connected in several ways. Glass, T.J., and C.P. were members of the Rolling 60's criminal street gang. C.P. and Glass exchanged 62 telephone calls in the two months before the robbery. Glass is depicted in a photograph with C.P. and C.S. C.S. had a moniker of NFKANT C-Loc (Infant C-Loc), after his father, who was a Rolling 60's gang member with the moniker C-Loc. C.S.'s parents rented a shop in a strip mall owned by Z.W. C.S.'s aunt, K.W., had two children with C.P.

A month before the robbery, C.S. and Glass exchanged texts, which were interpreted at trial by a gang expert. C.S. referred to Glass as "big cro" (big brother), which indicated that Glass had a higher status in the gang. C.S. texted they would "go troop Friday" (go on a mission). C.S. asked to borrow a "blower" and Glass agreed to give C.S. a "billy" (both of which referred to a gun).

A few days later, Glass texted C.S., "Hit me ASAP I got something up." He texted C.S. to "bring my seven back I need it." A gang expert testified that this referred to an FN Bristol Five-seven pistol, which is the model depicted in a photograph on Glass's phone.

Nine days before the robbery, C.S. texted Glass looking for "[s]umbody I could rob." C.S. asked if Glass had "any plugs" for "[w]eed [or] anything," which a gang expert explained referred to narcotics dealers. Glass responded, "U can't rob them." C.S. then texted, "I just followed these [M]uslim people [home] today . . . They had dough."[3]

---

[3] The victims are from Syria and speak Arabic and English.

3

Glass was arrested on July 9, 2018, for an unrelated crime and was released from custody on July 14. Between 4:00 and 7:00 p.m., either "a couple days" or approximately a week before the robbery, Z.W. and I.W. saw an SUV in the middle of the street containing four men looking at the victims' home.

Shortly after 6:00 a.m. on July 16, Glass and C.P. went to Walmart in a silver Chevrolet Traverse SUV owned by C.P.'s girlfriend. C.P. walked behind Glass into the store. Glass, pulling a shopping cart, went to the hardware department where zip ties, gloves, cleaning supplies, masks, and glasses were located. C.P. then took the cart, went to a register, and purchased Lysol, blue latex gloves, safety glasses, white masks, and zip ties. At the next register, Glass purchased khaki pants, shirts, and towels or cleaning rags.

At about 1:00 p.m. that day, Z.W. and I.W. were upstairs at home with their seven-month-old baby. Three men holding guns and wearing masks and dark sunglasses came up the stairs. Two wore blue latex gloves and one wore brown gloves.

One man pointed a gun at I.W. while she was holding her crying baby and said, "Make him shut up or I'll make him shut up." One man pointed a gun at Z.W.'s head while another zip-tied Z.W.'s hands and ankles. The men demanded money and guns. The robbers punched Z.W. in the eye, knocked him down, and kicked him. One man pistol-whipped Z.W., causing injuries that required staples and stiches to the back of his head.

At gunpoint, I.W. went to a closet and handed the gunman an envelope with $20,000 in cash and a bottle with $13,000. The robbers took a leather bag with $150,000 to $170,000, mostly in new, sequentially numbered $100 bills. They

4

also took jewelry worth $70,000 to $80,000, guns, bullets, silver bars, and hundreds of silver dollars. They put the stolen property into I.W.'s blue suitcase. One of the robbers wiped the stairwell with Lysol. Z.W. escaped and called police. The three men ran out of the house.

Surveillance video showed a man running down the street pulling a blue suitcase and a silver Traverse driving past him. Another video showed two men wearing blue shirts, beige pants, and white masks similar to those Glass and C.P. purchased at Walmart. A witness saw two men, one wearing a mask and dragging a blue suitcase, wave down a silver or bluish SUV and enter it. The vehicle sped away, but the witness caught up with it and photographed the license plate.

The robbers left behind blue towels, blue latex gloves, unused zip ties, and a container of hand wipes. The victims found bullet holes in a stairway railing and wall, and a bullet casing on the floor. A bullet was lodged in the bedroom wall.

T.J.'s DNA was found on a fragment of a glove left at the victims' home. C.P.'s DNA was identified on several zip ties. Glass's DNA was not found inside the house.

Six days after the robbery, C.P. was found in the Traverse and arrested. Under the floor mat were $3,500 in new $100 bills. The victims identified a photograph of the Traverse as the vehicle parked outside their home the afternoon before the robbery.

GPS data showed C.P.'s cell phone moving towards the victims' residence at approximately 5:41 p.m. the afternoon before the robbery. GPS data from a device attached to the Traverse showed it was at the victims' residence eight minutes later. At 12:45 p.m. and 1:37 p.m. the day of the robbery, C.P.'s

5

phone made and received calls from a location near the victims' home.

Two days after the robbery, K.W. texted C.P. a news article about the robbery and asked, "Did you see this?" C.P. responded, "Yeah. They got my plates. They looking for my car."

A month after the robberies, sheriff's deputies stopped Glass for traffic violations. He then backed into a patrol car, accelerated toward a deputy, led deputies on a chase, and pointed a stolen handgun at a deputy. In Glass's pants pocket were $6,300 in uncirculated sequentially numbered $100 bills. The series dates on the bills were consistent with the stolen money.

Glass's cell phone contained news photographs of police outside the victims' home after the robbery. Glass had a second cell phone that contained a photograph of the street sign on the same block as the victims' residence.

In October 2018, Glass spoke on the phone from jail. Glass said it was a home invasion robbery, and even though he "didn't go in there," he could be charged with aiding and abetting. He added that his lawyer was "saying . . . all right you didn't go in but you still could get charged with fucking aiding and shit. Aiding."

## DISCUSSION
### *Aiding and abetting theory*

Glass contends he was denied due process because the prosecution argued he was identified as one of the robbers inside the house, and did not assert the aiding and abetting theory until rebuttal argument. We reject this contention.

We review the due process claim de novo. (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 70 (*Quiroz*).) We conclude that

6

the accusatory pleading provided the required notice, the prosecution relied on evidence that Glass helped plan and prepare the robberies, and both the prosecution and the defense mentioned the aiding and abetting theory during trial. This is therefore not a case of "the People affirmatively misleading or ambushing the defense with their theory" of aiding and abetting. (*Id.* at p. 71.)

An accusatory pleading need not state the aiding and abetting theory. (§§ 31, 952, 971.) "[N]otice as a principal is sufficient to support a conviction as an aider or abettor." (*People v. Garrison* (1989) 47 Cal.3d 746, 776, fn. 12.) This is true even where the prosecution attempts to prove the defendant was a perpetrator. (*Ibid.* ["defendant's potential liability as an accomplice was before the jury despite the prosecution's concerted attempt to prove him the actual killer"].) Notice of an aiding and abetting theory is "constitutionally sufficient when the defendant is . . . alerted to the theory . . . by the People's express mention of that theory before or during trial sufficiently in advance of closing argument." (*Quiroz, supra*, 215 Cal.App.4th at p. 70.) That notice was provided here.

In her opening statement, the prosecutor discussed Z.W.'s identification of Glass and asserted that he was one of the robbers inside the home. But she also discussed the men in the SUV surveilling the victims' home the day before the robbery, Glass and C.P. taking the same SUV to Walmart to purchase materials for the robbery, Glass's phone calls to C.P. before the robbery, and Glass's texts with C.S. to plan the robbery. The prosecutor described Glass's later flight and attack on deputies as "the most powerful piece of evidence in this case . . . that really links him to the home invasion robbery."

7

Notice was also sufficient because Glass was alerted by evidence of planning and preparation presented by the prosecution. (*Quiroz, supra*, 215 Cal.App.4th at p. 70.) Nine days before the robbery, C.S. texted Glass, looking for somebody to rob. C.S. said he had followed "[M]uslim people" who had "dough," an apparent reference to Z.W. and I.W. A few days later, four males in the SUV surveilled the victims' home. The trial court reasonably concluded that the photograph of the street sign on Glass's phone was evidence he was one of the men in the SUV. On the morning of the robbery, C.P. followed Glass, who had a higher status than C.P. in the gang, into Walmart to purchase masks, zip ties, and other items for the robbery.

The robbery was committed by three men inside the house. Photographic and cell phone evidence linked Glass with C.P., whose DNA was found inside the house. Glass was found with $6,300 in new $100 bills.

In addition, the prosecution's trial brief gave notice that it intended to present the jail telephone call in which Glass impliedly admitted being involved in the robbery despite not being present inside the house. The prosecution's supplemental trial brief stated that Glass "was involved in the sophisticated planning of this home invasion robbery" and "the People are proceeding under a conspiracy theory."

While conspiracy and aiding and abetting are different theories, both can be based on conduct before commission of the target crime and can confer responsibility for conduct of other participants. (See *People v. Smith* (2014) 60 Cal.4th 603, 615-617.) At a hearing on the admissibility of a photograph during the prosecution's case-in-chief, the prosecutor said, "One of the theories that we're proceeding under is not only

8

aiding and abetting but a conspiracy theory."

Nor did closing argument mislead Glass into believing that his presence inside the house was the only evidence of his guilt. The prosecutor stated that the conspiracy began when Glass and C.S. exchanged texts about committing a robbery. She identified the Walmart surveillance video showing Glass and C.P. inside and outside the store as "some of the most compelling and incriminating evidence" of Glass's participation in a conspiracy.

Defense counsel was aware of the aiding and abetting theory. As noted in Glass's phone call from jail, his prior attorney discussed his possible liability as an aider and abettor. Glass's motion to dismiss the gang allegations after the preliminary examination (§ 995) argued that "there was no proof . . . that this defendant committed the offense or aided and abetted the co-defendant[s] with respect to the charges in the alleged home invasion robbery."

In closing argument, Glass's counsel argued not only that Z.W.'s identification was mistaken, but also that the evidence did not establish that Glass participated in the crimes or conspired to commit them. Counsel asserted that neither the communications with C.P. and C.S., nor his presence at Walmart, was "enough to prove Mr. Glass committed the crime of home invasion or was involved in any conspiracy to commit the crime of home invasion." Counsel also discussed the jail phone call that referred to aiding and abetting as the basis for his culpability.

In rebuttal, the prosecutor argued that even if the court were to reject the identification evidence (which it ultimately did), there was sufficient evidence to connect Glass pursuant to an aiding and abetting or conspiracy theory. The

9

prosecutor relied on the same evidence she argued previously, including the common gang membership of the participants, texts before commission of the crime, the date of Glass's release from custody, the Walmart purchases, and the jail phone call.

This case is unlike *Sheppard v. Rees* (9th Cir. 1990) 909 F.2d 1234, where a felony-murder theory was raised for the first time immediately before closing argument. (*Id.* at p. 1235.) "At no time during pretrial proceedings, opening statements, or the taking of testimony was the concept of felony-murder raised, directly or indirectly." (*Ibid.*) The Attorney General there conceded that "a pattern of government conduct affirmatively misled the defendant, denying him an effective opportunity to prepare a defense. 'The defendant was ambushed.'" (*Id.* at p. 1236, italics omitted.) Here, the prosecution at trial discussed liability based on planning and preparation for the robbery, and specifically aiding and abetting. The prosecution did not mislead or ambush the defense.

Nor is this case like *Lankford v. Idaho* (1991) 500 U.S. 110, which involved the "unique circumstance" in which the trial court sentenced the defendant to death after the prosecution provided formal notice that it was not seeking death. (*Id.* at p. 111.) There, the prosecution and defense argued other sentencing choices without the court giving any indication it was contemplating death. (*Id.* at pp. 119-120.) Here, the defense was on notice of the aiding and abetting theory, and in its argument discussed the evidence relevant to that theory.

### *Ineffective assistance of counsel*

Glass next contends that his trial counsel rendered ineffective assistance by failing to address the aider and abettor theory and by failing to object to the prosecutor's reliance on the

10

theory in rebuttal argument.  We disagree.

Counsel renders constitutionally ineffective assistance when "'counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms,'" and there is "'a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'"  (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)  Neither prong has been established here.

Defense counsel cross-examined prosecution witnesses, moved to exclude text messages between Glass and C.S., and moved to dismiss the gang allegations on the ground that the evidence did not show Glass "committed the offense or aided and abetted."  Counsel argued that the phone calls, texts, photographs, presence at Walmart, and possession of cash relied on by the prosecution did not link Glass to the crime.  Counsel was not ineffective by failing to raise or emphasize particular issues in argument.  (*People v. Thomas* (1992) 2 Cal.4th 489, 531.)  Counsel's failure to object to the accusatory pleading or to the prosecutor's rebuttal argument was not deficient because the objections would have lacked merit.  (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1080.)

Nor is it reasonably probable that absent any shortcomings of counsel the result would have been different.  We agree with the trial court's conclusion that the evidence of guilt was "overwhelming."  Glass has not shown a reasonable likelihood that additional objections or argument would have changed the outcome.

### Firearm use enhancements

Glass contends, and the Attorney General concedes,

11

that the enhancement for personal use of a firearm in the commission of counts 1 and 2 must be stricken. We agree.

An enhancement pursuant to section 12022.53 cannot be imposed in addition to the gang enhancement because there is no evidence that Glass *personally* used a firearm in the robberies. (§ 12022.53, subd. (e)(2); *People v. Brookfield* (2009) 47 Cal.4th 583, 595.) Moreover, because the information alleged the 12022.53 enhancements only pursuant to subdivision (b), the facts required to prove the enhancements pursuant to subdivision (e) were not "pled and proved." (§ 12022.53, subd. (e)(1); *People v. Anderson* (2020) 9 Cal.5th 946, 953-957.) Accordingly, we modify the judgment to strike the firearm use enhancements.

## DISPOSITION

The firearm use enhancements pursuant to section 12022.53 for counts 1 and 2 are stricken. The superior court clerk is directed to prepare amended abstracts of judgment reflecting the amended sentence and the fact that trial was by the court rather than by jury, and transmit a copy to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

NOT TO BE PUBLISHED.


TANGEMAN, J.

We concur:


GILBERT, P. J.          PERREN, J.

12

Henry J. Hall, Judge

Superior Court County of Los Angeles

_____

Shannon Chase, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.