Filed 5/6/22  P. v. Simmons CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C092973 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-167291) |
| v. | |
| MICHAEL BYRON SIMMONS, | |
| Defendant and Appellant. | |

Defendant Michael Byron Simmons was tried by jury and convicted of one count of committing a lewd or lascivious act on his niece and goddaughter, B., a child under the age of 14 years, in violation of Penal Code section 288, subdivision (a).  The trial court sentenced defendant to serve the middle term of six years in state prison and imposed other orders.

The central issues in this appeal involve a pretext phone call between B.'s father and defendant, in which defendant admitted touching the child's vagina on one occasion. Defendant contends:  (1) his trial counsel provided constitutionally deficient assistance

1

by failing to move to exclude defendant's admission during the phone call because it was involuntarily made as a result of coercion; and (2) the trial court prejudicially abused its discretion and violated defendant's federal constitutional rights by excluding testimony from a defense psychologist on the subject of defendant's mental processes, particularly his anxiety, as that was relevant to the jury's assessment of the statements he made during the pretext phone call. Defendant's remaining appellate contentions involve: (3) additional claims of ineffective assistance of trial counsel; and (4) an assertion of cumulative prejudice.

We affirm. As we explain, defendant's trial counsel made a rational tactical decision not to object to the admission of the pretext phone call. Defendant's assertion of ineffective assistance of counsel fails for that reason regardless of whether an objection to its admission would have been successful. Assuming, without deciding, that the trial court abused its discretion by excluding the proffered expert testimony, this did not violate defendant's constitutional rights and there is no reasonable likelihood of a more favorable result had this testimony been admitted. Defendant's additional claims of ineffective assistance of counsel fail for reasons explained later in this opinion. Finally, defendant's assertion of cumulative prejudice also fails.

FACTS

Defendant married B.'s aunt in 2012, when B. was five years old, but the family knew defendant for B.'s entire life. He was chosen to be her godfather because, as B.'s mother put it, "my daughter loved him very much. There was a special bond between them. He would always hold her when she was little, and he's always had a special affection towards her."

In January 2019, B. lived with her parents and four sisters in Olivehurst. She was 11 years old and would turn 12 the following month. Defendant, B.'s aunt, and their three children lived in Grass Valley, about 30 miles to the east.

2

With the exception of a four-month period of time immediately preceding the events giving rise to defendant's conviction in this case, during which B.'s mother and aunt were not on speaking terms, defendant saw B. "once a month," if not "every two weeks." They often went to the movies and out to eat. Defendant also routinely bought her presents, such as candy and toys, "whatever she asked for." However, during the four-month time period noted above, they had not seen each other at all.

Contact between defendant and B. resumed after B.'s mother sent a text message to her sister inviting her and defendant to B.'s birthday party. Defendant then made plans to take his daughter, R., to see a children's movie at the Studio Movie Grill in Rocklin and called B.'s house to invite her to join them. After B. received permission to go from her mother, defendant told her that he would pick her up at around 3:30 p.m. on Saturday.

Defendant left his house in Grass Valley at about 2:30 p.m. to give himself plenty of time to drive to B.'s house in Olivehurst. Defendant's daughter, who was about five years old at the time, sat in a car seat in the back. B. sat in the front passenger seat. For some reason, rather than taking a direct route to the Studio Movie Grill, defendant backtracked east to Grass Valley, then drove south to Auburn, and finally west to Rocklin. What would have been a 40-minute drive ended up taking about an hour and a half.

At the movie theater, B. intentionally sat next to R. instead of defendant. As she explained during her trial testimony, she was afraid defendant would touch her "private area" if she sat next to him, clarifying that this meant her vagina. B. testified that he had done so on multiple occasions during the previous two years, any time they went to a movie or out to eat together. During this particular trip to the movie theater, B. successfully avoided being touched during the movie.

After the movie, they planned to eat at a fast-food restaurant in Auburn. Back at the car, B. again sat in the front passenger seat and defendant, after securing R. into her car seat in the back, got into the driver's seat and placed his hand on B.'s thigh. He then

3

moved his hand up her leg and touched her vagina beneath her pants and underwear as he drove.  B. was scared and did not remember whether she told him to stop, but at some point he stopped touching her.

At the fast-food restaurant, defendant went through the drive-through and B. climbed into the back seat.  Defendant then drove her home, again extending the drive considerably.  Rather than taking a more direct route, he drove north to Grass Valley and then west to Olivehurst.

As mentioned, B. turned 12 in February 2019 and her mother invited defendant and B.'s aunt to her birthday party.  The night before the party, after B.'s mother told her that they were coming, B. started crying and said she did not want defendant to be there.  Her mother asked "why she was acting that way," but did not have time to talk to her about it.  The next morning, before the party, B. told her mother that she did not want defendant to touch her or come near her at the party.  When he arrived at the party, defendant gave B. a present in the kitchen, but she "threw the gift on the counter" and ran out of the kitchen.  When B.'s mother scolded her to "behave" around her guests, B. said she did not invite them to the party.  B.'s mother had never seen her act that way around defendant or anyone else.  The next day, B.'s mother again asked her "why she was acting that way" towards defendant at the party.  B. started crying and ran to her room.  Later in the week, B. disclosed to her mother that defendant was touching her inappropriately.

In late February or early March, B.'s mother took her to a local medical clinic and told medical staff what B. had told her about the sexual abuse.  That facility referred her to UC Davis Medical Center.  B.'s mother took her there on March 6.  B. disclosed the abuse to both medical staff and a clinical social worker in the emergency department, who reported the allegations to child protective services, who in turn filed a report with law enforcement in Yuba County.

4

During a subsequent forensic interview, B. again disclosed the abuse, specifically describing the incident in Rocklin. This caused the case to be forwarded to the Rocklin Police Department, where Detective Justin Infante orchestrated the pretext phone call between B.'s father and defendant that is central to the main issues raised in this appeal. We provide the details of this phone call during the discussion portion of this opinion. For now, we note that defendant initially denied abusing B., but eventually admitted touching her vagina, claiming he "only did it . . . once" and "just the outside." He also said he stopped going over to their house afterwards because he "was feelin' bad about it."

Defendant testified in his own defense and denied any abuse occurred. He claimed he made the statements noted above during the pretext phone call because he was afraid of B.'s father. According to defendant, B.'s father was "a very aggressive individual" and "an ex-boxer" who had previously claimed he "knew people in the cartels." Defendant claimed several statements made by B.'s father during the phone call were threats to physically harm defendant if he did not admit to touching B.'s vagina. These threats caused defendant to suffer an anxiety attack, and after several adamant denials, defendant decided to try to appease B.'s father by giving him an answer that defendant thought "he would accept as -- as a confession" without actually confessing to anything. According to defendant, when B.'s father was asking him to admit touching B.'s vagina, he said he "only did it . . . once" and "just the outside" because he thought B.'s father would think he was confessing, but in reality he was referring to having "touched her only one time in the vehicle which was to move her leg off of the gearshift, and that was on the outside of her leg . . . ."

Defendant was arrested the day after the pretext phone call and interviewed by Detective Infante. He maintained his innocence throughout the interview. We need not describe this interview in any detail. It will suffice to note that defendant, who initially claimed he did not remember going to the movies with B. on the day in question, did not

5

mention either being afraid of B.'s father or touching the outside of B.'s leg to move it off of the gearshift.[1]

DISCUSSION

I

*Central Ineffective Assistance Claim*

Defendant did not object to the admission of the pretext phone call below, forfeiting a direct challenge to its admission in this appeal. (See *People v. Quiroz* (2013) 215 Cal.App.4th 65, 78 (*Quiroz*).) Implicitly acknowledging this fact, defendant contends his trial counsel's failure to object amounted to ineffective assistance of counsel because a motion to exclude defendant's statements during the call would have been successful, and without these statements in evidence, a more favorable outcome was reasonably probable. The reason, according to defendant, that such a motion would have been successful is that B.'s father acted as an agent of the police when he spoke to defendant during the pretext phone call and he extracted an involuntary confession from defendant by making implied threats and promising leniency if defendant admitted B.'s allegations were true. We need not determine the merits of this hypothetical motion because defendant has not persuaded this court that his trial counsel did not make an informed and reasonable tactical decision not to object to admission of the phone call.

**A.**

*The Pretext Phone Call*

As previously mentioned, Detective Infante facilitated a pretext phone call between B.'s father and defendant. The call was recorded. The detective, who was

---

[1]  Competing expert testimony on the subject of child sexual abuse accommodation syndrome was also presented at trial, as was certain character evidence offered on defendant's behalf, none of which need be recounted here.

present during the call, told B.'s father to confront defendant with the accusations of abuse and provided various suggestions as to what to say to elicit a confession.

The phone call began with B.'s father telling defendant that B. had told him "something that's bad" and he wanted to "know what the deal is." B.'s father said he was the only one who knew and then made the accusation: "I wanna know when every time you would . . . take her to the movies touching her and everything why?" Defendant responded: "I didn't do nothing." When B.'s father said he took B. to the doctor and she had "an injury in her private part," defendant responded: "What?" B.'s father insisted that defendant "be honest" and explain what he had done. Defendant responded: "I didn't even do anything. I don't even know what you're talking about. What is - what is that? What is that what you're saying? What did . . . ." B.'s father clarified: "Okay, okay listen. Every time you had taken her to the movies you were touching her. I wanna know why." Defendant answered: "I put my arm around her. That's it." B.'s father responded: "No - no - no - no - no - no, not the arm around her. She told me that you - you touch her private part. I took her to the doctors and she's got an injury and the doctor say she's got an injury in her private part." Defendant responded: "Well, I didn't do anything."

B.'s father then said that he trusted defendant, gave him a place to stay when he needed it, and wanted to know why defendant betrayed that trust. He also suggested that defendant gave B. "all these good presents and everything" in order to continue touching her. B.'s father also accused defendant of continuing to touch her even though she told him repeatedly to stop.

At this point, B.'s father said: "Be a man - be a man and fucking stand up. I don't wanna go to the cops. I don't wanna do nothing like that. We're gonna handle this. But you have to be honest. How we gonna handle this? You have to be honest. I'm not gonna go to the cops. I don't want to ruin your life. I don't wanna do nothin' stupid but you have to be honest with me." Defendant again said all he did was put his arm around

7

her. This answer was not accepted by B.'s father, who repeated: "I don't wanna - I don't wanna go to the cops. How we gonna handle this?" Defendant said he did not know. B.'s father then repeated the accusation and added: "She's a little girl. And listen I'm not gonna go to the cops because I don't wanna do that to you, but at the same time you have to be a man and stand up and state the fuckin' truth." B.'s father continued: "Answer to me please. I don't wanna do something stupid. All I wanna know why. Just say."

In response, defendant first said he did not know and then said he did not touch her, prompting B.'s father to ask how it was that defendant did not know. Defendant again denied touching B. B.'s father said he knew defendant did it and added: "Listen . . . if you don't wanna admit it in front of me I'm going to the fuckin' cops and I'm gonna do that . . . . So you have to tell me you want me to go to the cops or you gonna tell me just between me and you and I'm not gonna tell [B.'s mother]. Or you want me to go to the cops? Because she's got an injury in her private part." Defendant answered: "Oh shit no man I don't know. I don't know what to say." B.'s father responded: "You don't know what to say? Okay so you want me to go to the cops? They're gonna get you . . . . And I don't wanna do that. So you fuckin' be - you have to be honest with me, okay? I'm not gonna do nothin' stupid. I'm not gonna go up there and beat the shit out of you. I'm not gonna do that (unintelligible) life either. But at the same time you have to be honest with me or you want me to tell [B.'s mother] and everybody and your wife and everybody that find out how you are. What do you want me to do? You have to be honest with me and say this fuckin' - [B.'s] telling me. I believe her. And I know that - that happened. That's why you always giving these good presents and everything. Either you tell me or I'm goin' to the cops."

Defendant again said that he did not know what to say. B.'s father responded that he wanted defendant to admit what he did and he also wanted to know why. Defendant responded: "I don't know why." In response to further exhortation from B.'s father,

8

urging defendant to "be a fuckin' man for once" and "admit it," promising not to "do something stupid" if defendant did admit to touching B., and also promising to tell both the police and family members if defendant did not admit what he did, defendant repeated twice: "I don't know why." He then stated: "Yeah, I mean, I - I did it - I only did it the once and I didn't do anything (though)." B.'s father responded: "What?" Defendant answered: "I only did it the one - the one and I didn't do anything else - (I mean) just the outside."

B.'s father followed up with: "Okay - okay you admit it now though. What did you do? Put your hand in - in her private part like she's telling me? Why . . . ? You have kids too. Why?" Defendant repeated: "I don't know why." He then added: "It - it was just that one time though but I didn't do it any other time though." He also said he stopped going over to their house afterwards because he "was feelin' bad about it."

The phone call ended with B.'s father thanking defendant for admitting what he did. He again promised not to go over to defendant's house to "do something stupid," like "beat the shit out of [him]," but also warned defendant not to come "around [his] family no more."

**B.**

*Analysis*

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid*.) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his

9

"representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833, disapproved on another point in *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842, 854-855, fn. 5; *Strickland v. Washington* (1984) 466 U.S. 668, 687.) Because defendant has not carried his burden with respect to the first element, we decline to address the second.

" 'Failure to object rarely constitutes constitutionally ineffective legal representation. . . .' [Citation.] Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 206.) "In reviewing an ineffective assistance of counsel claim, courts do not generally second-guess counsel's tactical decisions. [Citations.] 'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

10

that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.]' [Citation.]" (*In re Alcox* (2006) 137 Cal.App.4th 657, 665.)

Here, defendant's trial counsel made a tactical decision not to object to admission of the pretext phone call. Indeed, during discussion of motions in limine with the trial court, defense counsel noted that he filed an amended motion in which he "removed the issue regarding the involuntary statement." Later, the trial court specifically asked defense counsel: "Are you objecting or not objecting to the introduction of his pretext statement your client made?" Counsel responded: "No, sir." The trial court then ruled with respect to defendant's testimony, "if your client does testify, then I think he would be permitted to explain why he made certain statements" in the pretext phone call. Counsel responded: "Yes, sir." That is precisely what defendant did. As we have recounted more fully above, defendant claimed during his testimony that he essentially told B.'s father what he wanted to hear because defendant was afraid. According to defendant, he viewed statements made by B.'s father during the phone call as threats of physical violence, which caused him to suffer an anxiety attack, and after several adamant denials, defendant decided to try to appease him by giving him an answer that defendant thought "he would accept as -- as a confession." The jury obviously did not accept this testimony. But that does not render counsel's decision not to object to admission of the pretext phone call, and to instead attempt to rebut it with defendant's testimony, an unreasonable trial strategy.

*Quiroz, supra*, 215 Cal.App.4th 65, involved somewhat similar circumstances. There, the defendant challenged the admission of defense witness Gonzales's statement to police as coerced. Our colleagues at the Second Appellate District held the claim was forfeited by defendant's failure to object below and further concluded his trial counsel was not "constitutionally ineffective for not objecting." (*Id.* at p. 78.) The court explained: "Quiroz's trial counsel did more than not object—he called Gonzales as a witness and, during his direct examination, elicited facts about the alleged coerciveness

11

of the earlier police interrogation.  What is more, counsel then used those facts in his closing argument to make the point that the police were coercing statements from Gonzales and others to fit their theory that Quiroz was the shooter.  Counsel's decision to call Gonzales and elicit these facts in the service of his closing argument is a classic tactical decision.  It defeats any contention that counsel was asleep at the switch or otherwise ineffective." (*Ibid.*)

Similarly, here, defense counsel made a tactical decision not to object to the admission of the pretext phone call.  He then elicited testimony from defendant concerning the coerciveness of that phone call and used those facts in his closing argument in an attempt to persuade the jury that defendant's admissions during that phone call should not be believed because it was *only* in that phone call, under coercion, that defendant arguably admitted touching B., something he repeatedly denied during his subsequent police interrogation and his trial testimony.  Counsel specifically argued: "With [B.'s father], we know three things about that conversation.  He dominated, he overwhelmed, and he overpowered [defendant].  [B.'s father] is a tough guy.  [He] is not a guy to mess with, to screw around with.  He's a tough guy.  [Defendant] explained and defined that relationship that he has with [B.'s father].  He's afraid of this guy.  [¶]  [B.'s father] mentions in that recording, You know me, . . . .  You know how I react.  You also heard the language that [B.'s father] used.  I don't want to ruin your life.  I don't want to have to kick the shit out of you.  I don't want to do anything stupid.  And [B.'s father] would not take no for an answer."

We conclude it was within the realm of reasonable tactical decisions for defense counsel not to object to the pretext phone call, and instead use the facts of that phone call to cast doubt on the incriminating statements defendant made during that call.  This strategy was apparently designed both to elicit sympathy for defendant and to highlight the other statements made by defendant, where no alleged coercion was present, in which

12

defendant steadfastly denied touching B.  In short, defendant has not persuaded this court that counsel's performance fell below an objective standard of reasonableness.

## II

### *Exclusion of Expert Testimony*

Defendant also claims the trial court prejudicially abused its discretion and violated his federal constitutional rights by excluding testimony from a defense psychologist on the subject of defendant's anxiety and the effect it might have had on him during the pretext phone call.  We conclude any assumed abuse of discretion was harmless.

### A.

### *Additional Background*

Defendant moved in limine to allow expert testimony from a psychologist, Dr. Sharon P. Howard, regarding her psychological assessment of defendant.  The motion stated:  "Her assessments reported difficulties consistent with a significant depressive experience.  She mentioned that his internal thought processes were marked by confusion, distractibility, and difficulty concentrating, and he may experience thoughts as being somehow blocked or disrupted.  She also mentioned that he is likely to be plagued by worry to the degree that his ability to concentrate and attend are significantly compromised."  Defendant argued the doctor's testimony was relevant to the jury's assessment of the reliability of his statements during the pretext phone call because B.'s father caused him to "become distressed and to experience a high degree of tension and distraction."

Defense counsel reiterated this argument at the hearing on the motion, adding:  "[T]he doctor is not going to say, hey, this wasn't voluntary.  I'm just saying to you these are his thought processes, this is how it can affect why this person may have responded the way that he did under the circumstances.  That's it."  The trial court asked counsel whether the doctor intended to "say something similar to, you know, I have examined his

13

psychological makeup, and my opinion at the time he got the call, he was under a great deal of stress, he --" Defense counsel interjected: "Yes." The trial court continued, "-- he's the type of person who reacts poorly to stress --" Counsel again interjected: "Yes." The trial court concluded: "-- and doesn't necessarily, you know, whatever, and then to allow you to explain of why he might have made certain allegedly incriminating statements?" Counsel responded: "Correct." Asked whether the doctor intended to testify that certain specific statements were not credible or reliable, defense counsel answered: "How did his -- how did his -- these disorders that he has, these personality issues here, how -- what causes, you know, what would cause him to respond the way he did." Counsel then agreed with the trial court that defendant would have already testified before he planned to call the doctor to the stand. The trial court deferred ruling on the motion until after defendant testified.

After defendant's testimony regarding the pretext phone call, the trial court revisited the issue of Dr. Howard's testimony. Defense counsel again described the doctor's intended testimony, including defendant's "discomforting level of anxiety." The trial court again asked whether the doctor intended to offer an opinion with respect to the reliability of specific statements made during the phone call. Counsel answered: "She is not going to render any opinion whether these statements were involuntary or unreliable." Counsel then clarified that the doctor intended to testify that defendant had the following mental issues: "Anxiety, plagued by worry, ability to concentrate and attend are compromised, feels great deal of tension, difficulty relaxing, stress, anxiety, has overt physical signs of tension, sweaty palms, trembling hands." In response to further questioning, counsel agreed that this testimony was being offered to corroborate defendant's testimony about feeling anxious and making the statements he did during the pretext phone call in order to appease B.'s father.

14

After hearing argument from the prosecution, and further argument from defense counsel, the trial court excluded the testimony under Evidence Code[2] section 352, explaining that the testimony "has marginal relevance" and "could confuse the issue since it happened after -- it sounds like she was assessing mainly his psychological well-being after he had been arrested and charged, while he's in jail, and I also feel that it could open the door in cross-examination about him being in custody which I'm assuming you wouldn't want to highlight for the jurors."

**B.**

*Analysis*

"No evidence is admissible except relevant evidence" (§ 350), and "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (§ 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," including "evidence relevant to the credibility of a witness." (§ 210.) However, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) Section 352 "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but also "requires that the danger of these evils substantially outweigh the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; *People v. Tran* (2011) 51 Cal.4th 1040, 1047.)

Defendant argues "the trial court abused its discretion in denying his request to introduce Dr. Howard's expert testimony detailing his anxiety and the extent to which

---

[2]     Undesignated statutory references are to the Evidence Code.

15

that can cause someone in [his] position to say something, even something false, in order to appease the questioner and diffuse the situation." He takes issue with the trial court's conclusion that the proffered evidence was only marginally relevant, citing several cases holding the trial court abused its discretion in excluding evidence of a defendant's psychology or background where relevant to the question of the reliability of his confession.

One such case is *People v. Xiong* (2020) 54 Cal.App.5th 1046 (*Xiong*), in which this court held evidence of the defendant's experience growing up in a Thai refugee camp, specifically his understanding that denying allegations made by police officers in such a camp often resulted in violent retribution, was relevant to the defendant's state of mind when he made certain admissions during his postarrest interrogation. We concluded this evidence should have been admitted as relevant to his defense that he falsely confessed during the interrogation because he was afraid of the detectives and wanted the interrogation to end. (*Id.* at pp. 1066-1067, 1069-1070.)

There are obvious differences between an immigrant defendant's experience in a refugee camp and the more commonplace occurrence of having an anxiety disorder in terms of the materiality of such evidence to the question of whether the defendant's state of mind would have led him to falsely confess to a crime. For purposes of our analysis, we assume the trial court abused its discretion by excluding the proffered evidence.

Returning to *Xiong*, we concluded the error in excluding the evidence in that case was harmless. On the question of prejudice, we first noted the United States Supreme Court held in *Crane v. Kentucky* (1986) 476 U.S. 683 "that exclusion of testimony at trial of the circumstances of a defendant's confession relevant to voluntariness violated the defendant's constitutional right to present a defense." (*Xiong, supra*, 54 Cal.App.5th at p. 1071.) Although the proffered evidence of Xiong's background did not go to "the circumstances under which a confession or admission was obtained," we concluded it was nevertheless "germane to the probative weight to be given to the confession by the

16

jury," and therefore "potentially implicated" his "right to present a defense as to the credibility of the confession." (*Id.* at p. 1072.)

We then explained why Xiong's constitutional rights were not in fact violated. Relying on *People v. Page* (1991) 2 Cal.App.4th 161, we explained: "In [*Page*], the court applied *Crane* and concluded that the exclusion of certain evidence did not deprive the defendant of a meaningful opportunity to present a complete defense. There, the trial court excluded aspects of an expert's proposed testimony concerning the reliability of the defendant's confession. [Citation.] . . . Addressing the claim that preclusion of the evidence violated the defendant's right to present a defense and his right to fair trial, the *Page* court found no constitutional error. [Citation.] It noted that the *Crane* court had concluded, 'on the facts before it,' that ' "the *blanket exclusion* of the proffered testimony about the circumstances of [the defendant's] confession deprived him of a fair trial." ' [Citations.] But the *Page* court determined there were 'obvious and important differences' between the case before it and *Crane*. [Citation.] In *Page*, the trial court permitted the defendant and the prosecutor to thoroughly explore the physical and psychological environment in which the confession was obtained. [Citation.] Additionally, the defendant testified and presented his own version of the interrogation, explaining in detail how his statement came about. The trial court allowed the expert to testify to the psychological factors which could lead to a false confession, and defense counsel made the connection to those factors in closing argument. [Citation.] Thus, the *Page* court concluded that the excluded expert testimony was a 'far cry from the "blanket exclusion" of evidence the Supreme Court faced in *Crane*. Unlike Crane, Page was not "stripped of the power to describe to the jury the circumstances that prompted his confession," ' and 'that power was, at most, *marginally curtailed*. Consequently, in our view, the trial court's ruling did not deprive Page of " 'a meaningful opportunity to present a complete defense.' " ' [Citation.]" (*Xiong*, *supra*, 54 Cal.App.5th at pp. 1072-1073, italics omitted.)

17

Applying *Page*, we noted Xiong's testimony challenged the credibility of his confession, explained how the confession came about, and claimed that he was afraid of the detectives and "made up a story that sounded good" because of that fear. (*Xiong*, *supra*, 54 Cal.App.5th at p. 1073.) This testimony was also supported by psychological testimony concerning "compliant personality disorder." (*Ibid*.) And Xiong's trial counsel cross-examined the detectives about the interrogation and argued during closing argument that Xiong believed he had to "confess to something he did not do." (*Id*. at pp. 1073-1074.) On these facts, we concluded "there was ample evidence admitted on his contention that he falsely confessed because he was afraid of the detectives and essentially felt he had to tell them what they wanted to hear to end the interrogation uninjured. Similar to *Page*, . . . defendant's right to present a defense was only 'marginally curtailed.' [Citation.] Unlike in *Crane*, defendant here was able to provide an answer to the question: 'If [he] is innocent, why did he previously admit his guilt?' [Citation.] There was no 'blanket exclusion' of a defense and he was not deprived of a ' "meaningful opportunity to present a complete defense" ' on this point. [Citations.]" (*Id*. at p. 1074.)

Applying *Page* and *Xiong* to the facts of this case, we reach the same conclusion. Defendant offered a thorough explanation for his statements during the pretext phone call; he was afraid of B.'s father, an ex-boxer with a reputation for violence who claimed ties to the cartels. According to defendant, after several denials of the accusations, he ultimately said what he thought B.'s father would accept as a confession, when in reality he was not confessing to touching B.'s vagina, but rather touching the outside of her leg to move it off of the gearshift. In essence, defendant's explanation was that while he did not actually confess, his statements appear to be a confession because he had to appease B.'s father, who repeatedly promised to keep it a secret if defendant confessed and also repeatedly implied that he would physically harm defendant if he did not confess. Aside from defendant's testimony in this regard, the jury heard the pretext phone call and also

18

heard testimony from Detective Infante regarding how the call came about. While the proffered expert testimony would have corroborated defendant's claim that he suffered an anxiety attack during the phone call, and apparently would have also explained in general how anxiety can affect the reliability of statements made while in an anxious state, exclusion of this testimony did not deprive defendant of a meaningful opportunity to present a complete defense. Unlike in *Crane*, and like in *Page* and *Xiong*, "defendant here was able to provide an answer to the question: 'If [he] is innocent, why did he previously admit his guilt?' [Citation.]" (*Xiong*, *supra*, 54 Cal.App.5th at p. 1074.) Defendant's answer was two-fold: (1) he did not actually admit his guilt; but (2) it may look that way because he was afraid of B.'s father, for good reason, and had to tell him something he would accept as a confession to avoid physical harm. We conclude defendant's constitutional rights were not violated.

Under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, we must determine "whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. [Citation.] '[T]he *Watson* test for harmless error "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." ' [Citation.]" (*Xiong*, *supra*, 54 Cal.App.5th at p. 1074.)

The case against defendant was very strong. B.'s allegations of abuse were credible and corroborated by defendant's admission during the pretext phone call. Her testimony recounting that abuse was consistent with her prior statements to her mother, medical personnel, and law enforcement. Circumstantial evidence, such as the gifts defendant bought for B., taking her to movies, out to dinner, and unnecessarily extending

19

the amount of time he spent in the car with her, also provided corroboration for the allegations. As did B.'s behavior towards defendant at the birthday party. While none of these circumstances, alone or even viewed together, necessarily imply the existence of sexual abuse, when combined with B.'s testimony, her out-of-court statements, and defendant's admission during the pretext phone call, they add to an already strong case against defendant.

While the excluded testimony was relevant to the question of reliability of defendant's admission during the pretext phone call, as we have explained, defendant's testimony thoroughly apprised the jury of his explanation for admitting to touching B. The jury did not believe his testimony in this regard. We conclude there is no reasonable probability that expert testimony regarding defendant's anxiety would have changed the jury's assessment of the pretext phone call.

### III

### *Remaining Ineffective Assistance Claims*

Defendant further asserts his trial counsel provided constitutionally deficient assistance by: (A) eliciting damaging testimony during cross-examination of B.'s mother; (B) failing to object to improper opinion testimony elicited from Detective Infante; and (C) failing to object to the trial court's imposition of certain mandatory fines, fees, and assessments without a determination of his ability to pay. We address and reject each in turn.

### A.

### *Cross-examination of B.'s Mother*

The prosecution called B.'s mother as a witness. She testified about B.'s relationship with defendant, her behavior at the birthday party, disclosure of the abuse after the party, and bringing her to the local medical clinic and then to UC Davis Medical Center. During defense counsel's cross-examination, counsel asked whether B.'s older sisters had ever made any complaints about defendant. B.'s mother answered: "Only on

20

one occasion, um, my oldest daughter did." Counsel asked what the complaint was about. B.'s mother answered: "The complaint was that when he was living at the home that he had offered her alcoholic beverages, beer, and for her not to say anything." During redirect, B.'s mother elaborated that the alcohol incident happened about six years before trial. Her oldest daughter, S., was 18 years old at the time of trial. She did not say anything at the time defendant offered her the beer. However, after B. disclosed the abuse, her mother asked all of her girls whether defendant had done anything to them, at which point S. said defendant "entered her bedroom on one occasion and offered her alcoholic beverages" and told her "not to say anything to anyone, to keep quiet." During recross-examination, defense counsel asked B.'s mother whether she told an officer about the alcohol incident; she said she did.

Defendant argues defense counsel rendered constitutionally ineffective assistance by eliciting this "damaging information" from B.'s mother. We are not persuaded.

As our Supreme Court explained in *People v. Cleveland* (2004) 32 Cal.4th 704 (*Cleveland*): "Although in extreme circumstances cross-examination may be deemed incompetent [citation], normally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make. [Citation.] 'Even where defense counsel may have " 'elicit[ed] evidence more damaging to [the defendant] than the prosecutor was able to accomplish on direct' " [citation], we have been "reluctant to second-guess counsel" [citation] where a tactical choice of questions led to the damaging testimony.' [Citation.]" (*Id*. at p. 746.)

Here, defense counsel made a tactical decision to ask B.'s mother whether her other daughters had made any complaints about defendant. It is readily apparent that counsel reviewed the police reports, saw no other complaints mentioned therein, and assumed B.'s mother would answer no to his question. In asking the question, counsel ran the risk that B.'s mother would answer yes. However, counsel could have reasonably assumed any complaint made by one of the other daughters would have been minor since

21

B.'s mother either did not mention it to police or, as apparently happened, the officer did not deem it important enough to write down.  We cannot second-guess counsel's decision to take this calculated risk.  Finally, to the extent defendant blames counsel for opening the door for the prosecutor to ask B.'s mother about S.'s complaint on redirect examination, the *Cleveland* court further stated:  "Rigorous cross-examination risks eliciting damaging redirect examination.  Whether to run that risk is a tactical choice counsel must be permitted to make."  (*Cleveland*, *supra*, 32 Cal.4th at p. 747.)

We conclude defendant has not demonstrated deficient performance on the part of defense counsel in cross-examining B.'s mother.

## B.

### *Detective Infante's Testimony*

During the prosecutor's redirect examination of Detective Infante, the prosecutor asked whether he perceived defendant's reaction to the accusations made during the pretext phone call to be "normal."  The detective answered:  "To me it wasn't, no."  The prosecutor asked:  "And why is that?"  Detective Infante responded:  "My thing is I don't know why he would admit to something you didn't do if you didn't do it."  The prosecutor then asked what the detective understood defendant to mean by various statements defendant made after he admitted to touching B. in the phone call.  The detective understood "that's also why I didn't go anymore" and "probably why I felt bad also, 'cause I don't know why" to mean that "he felt bad for what he did" and that was "why he wasn't going to [B.'s] house anymore."  Finally, the prosecutor asked Detective Infante about certain pauses during the phone call.  The detective responded:  "A lot of times, the way we are trained with interviewing interrogation, sometimes that is the suspect buying time to come up with an explanation or to think about what he's going to say next."

Defendant argues defense counsel provided constitutionally deficient assistance by failing to object to this line of questioning because Detective Infante's answers amounted

to improper opinion as to defendant's guilt. As previously stated: " 'Failure to object rarely constitutes constitutionally ineffective legal representation. . . .' [Citation.] Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citation.]" (*People v. Huggins, supra*, 38 Cal.4th at p. 206.)

Here, there is no indication in the record as to why defense counsel did not object to these questions and answers. However, with respect to the pauses in the pretext phone call, counsel might have concluded Detective Infante's experience participating in over 20 pretext phone calls, and his more extensive experience interrogating witnesses during his 12 years as police officer, provided him with the specialized knowledge required to offer an opinion on tactics suspects use during questioning. Defendant acknowledges his testimony on this point "is akin to expert testimony," but complains that the prosecutor did not lay the proper foundation for such testimony. However, we are not reviewing whether the testimony was properly admitted over a foundation objection, but rather whether defense counsel was ineffective for not making such an objection. Had the proposed objection been made, we have no doubt the appropriate foundation could have been laid. Counsel was not ineffective for failing to delay the inevitable by interposing such an objection.

The remaining questions and answers are more troubling. As defendant argues in his briefing on appeal, Detective Infante was in no better position than the jury to determine what defendant meant by certain statements made during the pretext phone call, and he certainly should not have offered his opinion, albeit implied, that defendant was being truthful when he admitted touching B. during that phone call. (See *People v. Brown* (2016) 245 Cal.App.4th 140, 158 ["juries are competent to decide such things as witness credibility [citation], a defendant's guilt or innocence [citation], or whether a

crime has been committed [citation], without expert assistance in all circumstances"].) But again, we are tasked with determining whether counsel rendered constitutionally ineffective assistance by failing to object.

The Attorney General argues "counsel could have reasonably decided to highlight the shortcomings of Infante's testimony through cross-examination rather than a bare objection." We agree. While improper opinion, in these circumstances, counsel could have reasonably concluded Detective Infante's testimony was not particularly damaging because it merely said aloud what the jury was likely already thinking: Why would defendant have admitted to doing something he did not do? A sizable portion of defendant's testimony was devoted to explaining just that, as we have already recounted. Instead, counsel cross-examined the detective about whether he was able to view defendant's demeanor during the pretext phone call, assess his body language, or determine whether he was nervous, scared, stressed, depressed, or exhausted. Counsel elicited agreement that the goal of the phone call was to extract a confession. Counsel also walked the detective through defendant's multiple denials and each of the statements made by B.'s father forming the basis for defendant's coercion claim discussed above. Counsel further asked the detective for his opinion as to what B.'s father meant by certain statements he made, such as "I don't wanna do anything stupid." This cross-examination served as another opportunity to highlight the allegedly coercive nature of the pretext phone call. Defense counsel took full advantage of that opportunity.

We conclude it was within the realm of reasonable tactical decisions for defense counsel not to object to Detective Infante's testimony regarding defendant's statements during the pretext phone call.

## C.

### Dueñas *Claim*

Defendant's final assertion of ineffective assistance of counsel is based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157. Relying on that decision, defendant argues

24

defense counsel provided constitutionally ineffective assistance by failing to object to the trial court's imposition of various fines, fees, and assessments without first determining his ability to pay. However, for reasons explained more fully elsewhere, we are in agreement with the line of cases that conclude *Dueñas* was wrongly decided.[3] (See, e.g., *People v. Cota* (2020) 45 Cal.App.5th 786, 794-795; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279-281; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1068-1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 927-928.)

Stated simply, the strands of precedent relied upon by the *Dueñas* court in expanding due process protections to require an ability to pay determination before imposing a mandatory fine, fee, or assessment do not support, and indeed run contrary to, such an expansion. Imposition of the challenged financial obligations has not deprived defendant of access to the courts. Nor has defendant been incarcerated because of his inability to pay. Rather, he was incarcerated because he sexually abused B.

We therefore conclude any objection to the modest fines, fees, and assessments imposed in this case would have been properly rejected. Counsel was not ineffective for failing to lodge a futile objection. (*People v. Maury* (2003) 30 Cal.4th 342, 419 [counsel cannot be faulted for failing to make a futile objection].)

---

[3] Our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, which agreed with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373, but not restitution fines under Penal Code section 1202.4. (*Kopp,* at pp. 95-96.)

## IV

### *Cumulative Prejudice*

Finally, defendant claims he is entitled to reversal based on the cumulative prejudicial effect of the foregoing assertions of error. Not so. The only error potentially present in this case is the assumed evidentiary error discussed above, which we have concluded was harmless. As there is no additional error, there is no prejudice to accumulate. (See *People v. Williams* (2013) 58 Cal.4th 197, 291; *People v. Russell* (2010) 50 Cal.4th 1228, 1274.)

### DISPOSITION

The judgment is affirmed.

/s/
HOCH, J.

We concur:

/s/
HULL, Acting P. J.

/s/
KRAUSE, J.

26