Filed 9/11/25  In re J.H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.H., a Person Coming Under the Juvenile Court Law. | |
| | D084759 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J245737) |
| v. | |
| J.H., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Browder Willis and Robert J. Trentacosta, Judges.  Reversed in part and remanded.

Stephanie L. Gunther, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

In this juvenile court proceeding, the trial court sustained a petition brought under Welfare and Institutions Code section 602 alleging that J.H. committed vandalism resulting in damage of $400 or more (Pen. Code, § 594, subds. (a), (b)(1)) (count 1) and resisted a peace officer (*id.*, § 148, subd. (a)(1)) (count 2). The trial court adjudged J.H. to be a ward, placed him on probation, and ordered him to pay $6,151.69 in restitution to the victim of the vandalism.

J.H. contends that (1) insufficient evidence supports the trial court's finding on the vandalism count; (2) he did not receive constitutionally adequate notice of the People's intent to proceed on an aiding and abetting theory for the vandalism count because that theory was raised for the first time during closing argument; (3) the minute order from the disposition hearing improperly imposes a condition of probation that the trial court did not order at the disposition hearing; and (4) remand is required because the trial court failed to indicate whether the vandalism offense was a misdemeanor or a felony. The People concede that the last two contentions have merit but dispute the others.

We conclude that insufficient evidence supports the true finding on the vandalism count, and we therefore reverse that true finding. Further, because the trial court's order that J.H. pay restitution to the victim of the vandalism is based on the trial court's finding that J.H. committed vandalism, we vacate the restitution order. Finally, we conclude that the probation condition identified by J.H. must be stricken from the disposition order because the trial court did not orally pronounce it. We need not, and do not, reach the other issues raised by J.H.

I.

2

## FACTUAL AND PROCEDURAL BACKGROUND

Around noon on January 14, 2024, R.B. was driving his Chevrolet Silverado truck in a commercial district in El Cajon. He came upon at least 25 "kids" on bicycles. The bicyclists were riding in all lanes of the street, "going in and out of traffic" and "holding up traffic." As R.B. prepared to make a right turn onto another street, the bicyclists "were all over the place," with some on the right side of his truck, and some on the left side. One of the bicyclists later testified that R.B.'s truck almost hit some of the bicyclists who were in the right-hand lane.

At that point, while R.B. was looking in his left mirror and preparing to make the right turn, he saw an iced tea can hit the driver's side back corner of his truck's cab. The can exploded and fell into the truck bed. According to R.B., the can damaged his truck by denting the back corner of the cab. R.B. did not see anyone throw the can, but he inferred the can was thrown by a youth with a specific type of bicycle and wearing distinctive clothing. Using the hands of a clock to identify the youth's position, R.B. stated that the youth was located "between 6:00 and 7:00." According to R.B., he concluded that the youth located in that position was the person who threw the can because he did not see anyone else near his truck at the time.

J.H. participated in the group bicycle ride that R.B. witnessed. R.B.'s description of the youth he believed to have thrown the iced tea can was consistent with J.H.'s clothing and bicycle on that day. Further, R.B. later identified J.H. as the person to whom he was referring, both at the scene and again in court.

After the iced tea can hit the truck, R.B. completed his right turn and then immediately made a left turn into a parking lot. As R.B.'s truck entered the driveway entrance to the parking lot, R.B. heard what he assumed was a

3

loud kick to the right-hand side of his truck's tailgate. Upon hearing the "thump," R.B. looked and saw J.H., and no one else, in a position to have caused the thump, although he did not "visually see" J.H. "pick up his leg and kick the tailgate." R.B. explained, "I couldn't see him because he was behind the corner of my truck." However, because of where J.H. was located, R.B. was "one hundred percent positive" that J.H. was the person who struck the truck, presumably by kicking it. Once again referring to the positions on a clock, R.B. testified that J.H. "passed on the right-hand corner of my truck, probably at the 5:00 o'clock side."

After pulling into the parking lot, R.B. parked in front of a Starbucks where there were at least 15 to 20 bicyclists. R.B. got out of his truck, started taking photos, and according to one witness, yelled at the bicyclists. While R.B. was standing near the back of his truck, a bicyclist other than J.H. kicked the right-hand side of the truck's tailgate and hit its passenger-side mirror. R.B. saw those incidents take place in front of him as they occurred. R.B. believed that the kick he witnessed made contact in a location that was "pretty close" to the thump that R.B. heard while he was entering the parking lot driveway, presumably caused by a kick from J.H. When asked whether he could identify which specific parts of his truck were struck by the first kick and the second kick, R.B. stated, "In the same area. I can't tell you which one hit which point."

The bicyclists then left the parking lot, going in different directions, and R.B. drove after the group that included J.H. At one point, as the bicyclists drove through the city streets, the group went into and out of another parking lot, and R.B. followed them as they did so. At that location, some of the bicyclists threw large dirt clods and rocks at R.B.'s truck. R.B.

4

was certain that J.H. did not throw rocks and dirt clods, as J.H. was already bicycling down the street at the time, ahead of R.B.'s truck.

Eventually, as R.B. was following the bicyclists, the police arrived. After some delay, J.H. stopped for a police officer, but as the officer got out of his vehicle, J.H. rode off and then refused to stop when repeatedly ordered to do so. Finally, an officer was able to stop J.H. by taking him to the ground.

R.B.'s truck sustained damage during the incident. In addition to the dent in the back left corner of the cab where the iced tea can hit it, the truck's tailgate had a single dent on the right-hand side. R.B. received an estimate from an auto body repair shop in the amount of $6,151.69 to fix the damage to the tailgate and the corner of the cab.

A wardship petition was filed in juvenile court pursuant to Welfare and Institutions Code section 602 alleging that J.H. committed vandalism which caused damage of at least $400 (Pen. Code, § 594 subds. (a), (b)(1)) (count 1) and resisted a peace officer (*id.*, § 148, subd. (a)(1)) (count 2).

At the jurisdictional hearing, the evidence included photographs of the dent on the truck's tailgate. During R.B.'s testimony, he noted that in one of the photographs of the tailgate, there appeared to be two shoeprints in the area of the dent. One shoeprint was on the bottom right area of the dent, and the other shoeprint was on the top left area of the dent. During cross examination, defense counsel asked, "Only one of those kicks left a dent and a footprint on your tailgate; correct?" R.B. replied, "No. Two footprints." When defense counsel followed up by asking, "And which of these footprints caused the majority of the damage or all of the damage to your tailgate?," R.B. answered "[b]oth footprints did it."

An investigator for the public defender's office testified that she had enhanced the relevant photograph to be able to better see the shoe tread that

5

appeared in the shoeprints. Based on that enhanced photograph, which was received into evidence and which we have viewed, the investigator determined that what R.B. assumed were two different shoeprints from two different people were actually a single shoeprint from the same shoe. The investigator suspected that the appearance of two different shoeprints on the dent was created because the person's foot "tilted" or "rotated" to the left at the end of the kick. Using the shoe tread markings, the investigator determined that the shoeprint was from a DC Metric brand shoe. The tread appearing to the bottom right of the dent was from the heel area of the DC Metric sole, and the tread appearing to the upper left of the dent was from the toe area of the DC Metric sole. Based on our review of the photograph of the DC Metric shoe that the investigator used for her comparison, along with the photographs of the shoeprint markings that were entered into evidence, we have confirmed that the investigator's conclusion about the shoeprint markings is well founded.

The undisputed evidence was that, during the incident, J.H. was wearing Nike Air Force shoes, with well-worn soles. The tread on the sole of those shoes is completely dissimilar to the tread on the DC Metric soles and does not match any of the shoeprints on the dent in the truck's tailgate.

During closing, the People argued that in light of the evidence about the shoeprints, "if the Court doesn't believe that the tread left on that truck belonged to [J.H.]," it was still the case that "[J.H.] kicked the truck the first time. [J.H.] maybe didn't leave tread on the truck, but he did leave a dent." The People also argued that J.H. "aided and abetted the entire vandalism," regardless of the specific damage caused by his direct acts.

After a break, but before the trial court delivered its findings, defense counsel objected to the People "amending their case to allege aiding and

6

abetting" "at this point in the case." The trial court stated it would "note [the] objection for the record," but dismissed the objection on the ground that aiding and abetting was "just a theory."

The trial court made a true finding on both counts in the wardship petition. With respect to the vandalism count, the trial court found insufficient evidence that J.H. threw the iced tea can and dented the truck cab, but sufficient evidence that J.H. kicked the tailgate. Specifically, the trial court stated, "While [R.B.] did not identify you as the person who threw that initial object, he was . . . a hundred percent certain that you were at that five or six o'clock position at the time of the thunk. And he never wavered from that description." With respect to the shoeprint evidence, the trial court stated, "I certainly find myself interested in this whole idea of what was happening with this footprint," and it noted that "the public defender investigator did a great job of researching." However, ultimately, relying on R.B.'s identification of J.H. as the first person who kicked the tailgate, the trial court explained that although the testimony about the shoeprint, "certainly made me look at your evidence really closely, it didn't rise to the level of reasonable doubt to negate the testimony of [R.B.]. . . . He was certain that you were there at the time of the thunk. . . . And he was adamant. And I don't find anything that credibly created doubt as to the quality of his testimony or his identification."

Immediately after the trial court made true findings on both counts, defense counsel asked the trial court to clarify, for the purpose of a future restitution order, whether J.H. was responsible for the damage caused to the truck's cab (as opposed to the tailgate). The trial court initially stated that its tentative ruling was "to exclude that part of the damage and to limit the part of the damage to [the] tailgate." However, after hearing argument from

7

the People on their theory that J.H. aided and abetted all of the vandalism to R.B.'s truck, the trial court concluded that J.H. was "liable for all of it" as "the instigator of the entirety of the vandalism."

At a subsequent restitution hearing, the trial court ordered J.H. to pay $6,151.69 in restitution, which was based on the full amount of the repair estimate obtained by R.B. At the jurisdictional hearing, the trial court adjudged J.H. to be a ward and placed him on probation.

## II.

## DISCUSSION

### A. *J.H.'s Challenge to the Sufficiency of the Evidence*

J.H. first argues that insufficient evidence supports the true finding on the vandalism count.

#### 1. *Standard of Review*

"Our review of [J.H.'s] substantial evidence claim is governed by the same standard applicable to adult criminal cases. [Citation.] 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' . . . ' "[O]ur role on appeal is a limited one." [Citation.] Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. [Citation.] Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.' " (*In re V.V.* (2011) 51 Cal.4th 1020, 1026, citations omitted.) We "may consider only those inferences that are reasonably supported by the record. ' "[A]

8

reasonable inference . . . 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.' " '. . . . It 'must logically flow from other facts established in the action,' and it cannot be 'based entirely on the suspicions of the officers involved in the case and the conjecture of the prosecution.' " (*People v. Ware* (2022) 14 Cal.5th 151, 167–168 (*Ware*), citations omitted.)

> 2. *Insufficient Evidence Supports a True Finding on the Vandalism Count Under the Theory That J.H. Directly Caused Damage to R.B.'s Truck*

The crime of vandalism is set forth in Penal Code section 594, subdivision (a). "Every person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism: [¶] (1) Defaces with graffiti or other inscribed material. [¶] (2) Damages. [¶] (3) Destroys." (Pen. Code, § 594, subd. (a).) If, as the trial court found here, "the amount of defacement, damage, or destruction is four hundred dollars ($400) or more," the offense is punishable either as a felony or a misdemeanor. (*Id.*, § 594, subd. (b)(1).)

J.H. argues that, for two separate reasons, insufficient evidence supports a finding that he was a direct perpetrator of vandalism: (1) no substantial evidence supports a finding that he acted with malice in kicking the truck; and (2) no substantial evidence supports a finding that he caused damage *in any amount* to the truck. We need not decide whether the evidence supports a finding of malice because, as set forth below, insufficient evidence supports a finding J.H. caused any damage to R.B.'s truck, even crediting R.B.'s testimony (as did the trial court) that (1) J.H. was the cause of the "thump" to the tailgate, and (2) both visible shoeprints contributed to the dent.

9

As we have explained, the trial court found that the evidence did *not* support a finding that J.H. threw the iced tea can. That specific finding of fact in favor of J.H. is not challenged in J.H.'s appeal. Accordingly, to determine whether the record contains substantial evidence that J.H. caused any damage to the truck, we focus on whether the evidence supports a finding that J.H. caused damage by kicking the truck's tailgate.

On that question, the photographic evidence and the testimony from the defense investigator regarding the shoeprint markings on the truck's tailgate are dispositive. We have examined the relevant photographs, all of which show one dent to the tailgate. As the witnesses noted, the photographs show shoeprint markings directly above and below the dent. As established by the testimony of the defense investigator, as well as from the photographs presented during her testimony, the shoeprint markings are both from a DC Metric brand shoe. It is undisputed that J.H. was not wearing DC Metric shoes during the incident, and the tread on the sole of J.H.'s shoes was completely dissimilar to the tread on the DC Metric soles. Therefore, there is no substantial evidence that a kick from J.H.'s shoe caused the dent on the tailgate. In fact, the evidence is contradictory to any such inference.

During his testimony, R.B. disagreed with defense counsel's suggestion that only one of the kicks caused the dent. However, R.B. was very clear that he reached that conclusion based on the fact that he saw two different shoeprints on the dent. Normally, "the testimony of a single witness is sufficient to support a conviction." (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) However, that rule does not apply when the testimony "describes facts or events that are physically impossible or inherently improbable." (*Ibid*.) R.B.'s *assumption* that one of the shoeprints on the dent was from J.H.'s kick is undermined by the *evidence* showing that neither of the shoeprint

10

markings were from J.H.'s shoes. As such, even though we have no basis to question the trial court's decision to credit R.B.'s testimony that (1) J.H. caused a thump to his truck's tailgate by kicking it; and (2) both of the shoeprints on the tailgate contributed to the dent, without a reason to conclude that J.H.'s kick caused one of the shoeprints, there is no logical basis for R.B.'s assumption that the dent was caused by *both* J.H.'s kick *and* the later kick that he witnessed while standing nearby.

In short, because (1) there is a single dent on the tailgate; (2) the uncontradicted evidence shows that neither of the two shoeprints on the dent came from J.H.'s shoe; and (3) R.B.'s assumption that the dent was caused by two different kicks is inconsistent with the physical evidence, the circumstances do not reasonably justify an inference that J.H. damaged the truck when he made contact with it. As we "may consider only those inferences that are reasonably supported by the record" (*Ware*, *supra*, 14 Cal.5th at p. 167), we conclude that insufficient evidence supports a finding that J.H. "deface[d]," "damage[d]" or "destroy[ed]" R.B.'s truck as required to establish the commission of vandalism in violation of Penal Code section 594, subdivision (a).

> b. *Insufficient Evidence Supports a Finding That J.H. Aided and Abetted Vandalism Committed By Others*

As an alternate ground for supporting a finding that J.H. vandalized R.B.'s truck, the People argue that J.H. aided and abetted other perpetrators, who actually inflicted damage. Specifically, according to the People, J.H. aided and abetted either the person who kicked the truck in R.B.'s presence while it was parked at Starbucks, or the group of people who threw rocks and dirt clods at the truck while R.B. was following the bicyclists through the city streets. The People's theory is that J.H. was an aider and abettor because, as the trial court stated in deciding to hold J.H. financially responsible for all of

11

the damage to the truck, J.H. was "the instigator of the entirety of the vandalism."

"All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (Pen. Code, § 31.) "Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "[A]ider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea— knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) The actus reus requirement must involve "some affirmative action.' " (*People v. Partee* (2020) 8 Cal.5th 860, 868, italics omitted.) The actus reus requirement is satisfied where the aider and abettor "by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561; see also *People v. Holford* (1965) 63 Cal.2d 74, 81, ["[t]he person who advises and *encourages* the commission of the crime while present at its perpetration surely falls within the definition of a principal," italics added].)

Based on these principles, CALCRIM No. 401 sets forth the following elements for a finding of guilt based on a theory of aiding and abetting:

> "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> "1. The perpetrator committed the crime;
>
> "2. The defendant knew that the perpetrator intended to commit the crime;

12

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"AND

"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (CALCRIM No. 401.)

Here, J.H. does not dispute that the first element is present. Someone (or multiple people) did, in fact, vandalize R.B.'s truck by denting the tailgate and throwing objects at it. As we will explain, however, the evidence is insufficient to support a finding in favor of the People on the second, third and fourth elements set forth in CALCRIM No. 401.

Addressing the second and third elements, the People argue that the evidence "support[s] a reasonable inference that [J.H.] knew and shared in the perpetrators' intent to vandalize the truck." To support their argument, the People describe J.H. as "the leader of the group." However, that description is misleading. Although a fellow participant in the group bicycle ride testified that J.H. was "leading" the ride, that witness used the word "leading" to describe J.H. as being *out in front of the group*, marking the intended route of the bicycle ride. That witness did not describe J.H. as someone who took the lead in encouraging a group activity of vandalism. Next, the People point to J.H.'s "continued engagement with the group" during the bicycle ride. It is true that J.H. was present in the Starbucks parking lot with the entire group of bicyclists and that he then stayed with the subgroup of bicyclists whom R.B. followed as they rode through the city streets. But J.H.'s continued participation in the group bicycle ride, by itself, does not suggest that J.H. knew that any of his fellow participants intended

13

to damage R.B.'s truck, or that he intended to encourage that activity. Such an inference is especially unwarranted because R.B. testified that while the other bicyclists threw the rocks and dirt clods at his truck, J.H. had already bicycled away from those perpetrators, ahead of R.B.'s truck, and took no part in throwing the objects. Finally, the People rely on J.H.'s failure to stop for law enforcement. A failure to yield could reasonably support an inference that J.H. had a guilty conscience for his participation in the incident. However, that fact, standing alone, does not provide substantial evidence that J.H. anticipated and encouraged other people to damage R.B.'s truck. Therefore, we find no substantial evidence to support a finding that J.H. knew of, and shared in, the perpetrators' intent to vandalize R.B.'s truck.

Regarding the fourth element, the People contend that J.H.'s actus reus consisted of *encouraging* and *instigating* the vandalism committed by third parties. Specifically, the People argue that J.H. "instigated the vandalism by throwing a full iced tea can at the truck and then kicking the tailgate hard enough to dent it." They contend that J.H.'s "own actions, in twice making contact with the truck, support an inference that he . . . encouraged the others to vandalize [the truck] by taking the metaphorical first swing at it." The argument is not persuasive because it is based on a series of incorrect factual premises. As we have explained, the trial court did *not* find sufficient evidence to establish that J.H. was the person who threw the iced tea can. Further, the record does not support a finding that J.H. kicked the truck's tailgate "hard enough to dent it." On the contrary, as we have explained, the shoeprint markings on the truck contradict such a finding. Finally, the record contains no evidence that any other bicyclist was watching J.H. kick the truck. Indeed, R.B. testified that J.H. was the only person on the right-hand corner of his truck when he heard the thump. Without evidence that

the members of the bicycle group who later vandalized R.B.'s truck had any knowledge of J.H.'s earlier kick, the record does not support a finding that, by kicking R.B's truck, J.H. encouraged other members of the group to engage in similar activity.

Therefore, we find no sufficient evidence in the record to support the People's contention that J.H. aided and abetted the vandalism to R.B.'s truck by encouraging and instigating it.[1]

Because the evidence does not support a finding of vandalism under either a direct-perpetrator theory or an aiding-and-abetting theory, we reverse the judgment insofar as it adjudges J.H. to have committed vandalism. Further, because the restitution order was premised solely on the true finding on the vandalism count, the restitution order must be vacated.

B.    *The Condition of Probation Advising J.H. "To Not Associate With Negative Peers" Must Be Stricken From the Disposition Minute Order*

The minute order from the disposition hearing sets forth the conditions of J.H.'s probation. Among other things, the minute order states that "[J.H.] is advised to not associate with negative peers" (the negative peer condition). (Capitalization omitted.)

J.H. challenges the negative peer condition on two grounds: (1) it is unconstitutionally vague and overbroad, and (2) the trial court did not order it during the disposition hearing.

_____

[1]    Having concluded that insufficient evidence supports a finding that J.H. committed vandalism as an aider and abettor, we need not, and do not address J.H.'s contention that he did not receive constitutionally adequate notice that the People intended to proceed on an aiding and abetting theory when the People identified that theory for the first time during closing argument.

15

The People agree that the negative peer condition was not ordered by the trial court at the disposition hearing and should therefore be stricken. Specifically, during the disposition hearing, the trial court ordered certain conditions of probation by referring to the numbered conditions that the probation officer recommended in the social study that was submitted in connection with the disposition hearing. The negative peer condition was not identified in the social study, and the trial court did not state it was adding that condition of probation during the disposition hearing.

"The record of the oral pronouncement of the court controls over the clerk's minute order." (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.) When there is a discrepancy between the minute order and the trial court's oral pronouncement, we may order that the minute order be modified "to reflect the conditions orally imposed by the court." (*People v. Gabriel* (2010) 189 Cal.App.4th 1070, 1073; see also *People v. Contreras* (2015) 237 Cal.App.4th 868, 881 [ordering that the minute order be corrected to properly reflect the orally pronounced conditions of probation].) Here, because the negative peer condition was not orally pronounced by the trial court, we order that it be stricken from the minute order that sets forth the conditions of J.H.'s probation.[2]

---

[2] Because we resolve J.H.'s challenge to the negative peer condition on the basis that the trial court did not orally pronounce it, we need not, and do not, consider J.H.'s contention that the negative peer condition is unconstitutionally vague and overbroad.

## DISPOSITION

The true finding on the vandalism count (count 1) is reversed, and the order of restitution in the amount of $6,151.69 is vacated. The matter is remanded to the juvenile court for a new disposition hearing.


IRION, J.

I CONCUR:


O'ROURKE, Acting P. J.

17

RUBIN, J., Dissenting.

I respectfully dissent in part. Adhering to the substantial evidence standard, there was sufficient evidence that J.H. directly perpetrated and aided and abetted vandalism.

A.    *Vandalism — Direct Perpetration*

In reviewing a challenge to a trial court's factual findings, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.)

When making their decisions trial judges are not, as we are, limited to a cold record. In addition to any physical evidence (here, photographs), they hear the witnesses testify, observe their demeanor on the witness stand, evaluate the character of the testimony, and at the end of the proceeding, decide what occurred. (Evid. Code, § 780; CALCRIM No. 226.) Indeed, it is well settled law that "[Courts of Appeal] must defer to the trial court's factual assessments" that are based on its assessment of live testimony because " '[w]e review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses.' " (*In re Luke M.*

(2003) 107 Cal.App.4th 1412, 1427.) Observing how lay and expert witnesses testify can make all the difference.

Here, the trial court heard testimony about the source of damage made by minors to the back of R.B.'s truck. On one side of the case the truck's driver, R.B., said he saw J.H. kick his truck. The key part of the defense case was a defense investigator who opined that based on photographs at which she looked, there was a single dent belonging to a shoe not worn by J.H. Further, she felt that what appeared as a second imprint was actually caused by a single kicker's foot (not J.H.) moving slightly.

In its role as fact finder, having heard the testimony, and observed the witnesses on the stand, the trial court did not wholly accept the defense investigator's opinion regarding the single dent theory. Instead, the trial court found only "that [the] heel print with the lettering" on the lower portion of the dent was "clearly not" from J.H.'s shoe. The trial court went on to observe that there were "many theories" as to whether or not both shoeprints came from the same shoe or kick, stating "there's questions as to what the value of that information is." Ultimately, the trial court found that the defense investigator's version of events "didn't rise to the level of reasonable doubt to negate the testimony of [R.B.]."

These are the kinds of decisions triers of fact are better positioned to make than we. Evaluating the quality of the testimony using factors unavailable to an appellate court (e.g., witness demeanor during testimony, the quality of the testimony), the trial court simply credited R.B.'s testimony over that of the defense investigator on the issue of separate kickers causing separate shoeprints. We should not disturb that finding because " '[i]n reviewing factual determinations for substantial evidence, a reviewing court

2

should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." ' " (*People v. Helzer* (2024) 15 Cal.5th 622, 646.)

As an example of why I would affirm, I turn to the photographs of the dented tailgate. In the photographs one can see a DC Metric shoeprint on the lower right side of the tailgate dent. But based on the quality of the photographs, and consistent with R.B.'s testimony, the higher shoeprint to the left is not clear enough to make a definitive determination regarding tread. Additionally, attributing that higher shoeprint to J.H. corroborates R.B.'s testimony. R.B. said that the second kick from the other bicyclist was in the "[b]ottom right-hand corner . . . right above the bumper" and the first kick from J.H. "was up higher."

In sum, I find the photographic evidence and defense investigator's opinion are not dispositive, nor can it be fairly claimed they make R.B.'s testimony improbable. Rather, the defense investigator's testimony merely conflicted with R.B.'s account that J.H. damaged his tailgate, and the trial court resolved that factual question by accepting R.B.'s testimony. We should not reweigh that determination on appeal, and the causation element of the vandalism count is adequately supported on a direct perpetrator theory.

## B.     *Vandalism — Aiding and Abetting*

"Among the factors which may be considered in determining aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the crime, including flight." (*In re Jessie L.* (1982) 131 Cal.App.3d 202, 217.) Additionally, "the aider and abettor need not have advance knowledge of the crime or the perpetrator's intent. 'Aiding and abetting may be committed "on the spur of the moment," that is, as instantaneously as the criminal act itself.' " (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1148.)

J.H. was present at the scene of the crime, and the preorganized group ride included his companions. J.H. also played at least a partial leadership role. One of the fellow riders testified that J.H. was in front of the group most of the time "leading [the] whole group." That group rode "[a]ll over the place," holding up traffic, grabbing cars, and yelling.

Even though the trial court did not find that J.H. threw the iced tea can, R.B. testified that J.H. was about ten feet away and the only rider in the area when the can exploded against the truck, indicating J.H. was aware of the first act of vandalism. J.H. then kicked R.B.'s truck, which led to a second kick in the same location from a rider in a red hoodie, the swarming and hassling of R.B. and other drivers, and eventually the throwing of rocks and dirt clods by the rider in the red hoodie and others.

Although J.H. was riding away when the others threw rocks and dirt clods, J.H. previously rode with that group. Additionally, the entire incident lasted about 20 minutes, and R.B. described J.H. and another rider as "the worst outta them all." Finally, J.H. fled, indicating consciousness of guilt. (*People v. Price* (2017) 8 Cal.App.5th 409, 458.)

Based on this evidence, the trial court could have reasonably concluded that J.H. was aware that his fellow riders intended to vandalize, and that he instigated and encouraged that vandalism. I therefore find sufficient evidence that J.H. aided and abetted the vandalism.

1

*C.      Vandalism — Malice*

Although not reached by the majority, I briefly address J.H.'s argument regarding insufficient evidence of malice.  Malice under Penal Code section 594 " 'may be "presumed" or "implied" from the intentional doing of the act without justification or excuse or mitigating circumstances.' " (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1282.)

J.H. "does not necessarily deny that he touched the truck with his foot," instead claiming that the contact could have been accidental or in self-defense.  J.H. asserts it was a chaotic scene, and two witnesses testified that R.B. almost hit the cyclists.  However, those witnesses did not state that R.B. almost hit J.H., nor did they witness J.H kicking the truck.

Further, R.B. described the cyclists as "swarming" his truck  and "hassling" and "harassing" other drivers.  R.B. testified that he was "[o]ne hundred percent positive" that J.H. kicked his truck, describing it as a "hard kick" and "really loud."  J.H. also fled the scene, ignoring repeated demands from police to stop, from which consciousness of guilt may be inferred. (*People v. Price, supra,* 8 Cal.App.5th at p. 458.)  Based on this evidence, the trial court could have reasonably inferred that J.H intentionally acted " 'without justification or excuse or mitigating circumstances.' " (*People v.*

---

1      I also disagree with J.H.'s claim that he did not have adequate notice of the aiding and abetting theory.  "Under California's practice of short-form pleading, an instrument charging a defendant as a principal is deemed to charge him as an aider and abettor as well. [Citation.]  This 'notice as a principal is sufficient to support a conviction as an aider and abettor . . . " . . . without the accusatory pleading reciting the aiding and abetting theory." ' " (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 70.)  I see no federal violation either because J.H. was aware from the start that he was alleged to act with "a large group of juveniles," and the People did not affirmatively mislead or ambush. (*Id.* at p. 71)

*Kurtenbach, supra,* 204 Cal.App.4th at p. 1282.)  I therefore find sufficient evidence of malice.

### D.    Conclusion

For these reasons, I respectfully dissent in part.  I would affirm the true finding on the vandalism count and remand the matter to the juvenile court to declare whether that offense is a felony or misdemeanor.  I concur that the challenged probation condition must be stricken.


RUBIN, J.